1
2
3
4
5
6

IN THE UNITED STATED DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8  | INTERNATIONAL UNION OF PAINTERS | No.
9  | AND ALLIED TRADES DISTRICT | COMPLAINT AND PETITION TO
   | COUNCIL 5, | VACATE ARBITRATION AWARD

Plaintiff,

v.

ALLIANCE PARTITION SYSTEMS;
ANNING-JOHNSON COMPANY; D.L.
HENRICKSEN, CO. INC; ENDERIS
COMPANY, INC.; EXPERT DRYWALL,
INC.; FIRSTLINE SYSTEMS INC.;
GORDON BROWN ASSOC., INC.; KHS&S
CONTRACTORS; MEHRER DRYWALL,
INC.; MILLER & SONS; NELSON
CONSTRUCTION CO.; NORTHWEST
PARTITIONS, INC.; OLYMPIC
INTERIORS, INC.; PARTITION SYSTEMS
INC.; VANDERLIP & COMPANY, INC.;
WESTERN PARTITIONS, INC.,

Defendants.

Plaintiff International Union of Painters and Allied Trades District Council 5 ("IUPAT

District Council 5" or "Union") hereby brings this action against multiple employers represented

for the purposes of collective bargaining by the Northwest Wall and Ceiling Contractors

Association ("NWCCA Employers" or "the Association Employers") to vacate an arbitration

COMPLAINT AND PETITION TO VACATE
ARBITRATION AWARD - 1

18 WEST MERCER ST., STE. 400   BARNARD
SEATTLE, WASHINGTON 98119   IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132   LAVITT LLP

award issued by Arbitrator Timothy Williams under the grievance and arbitration procedures set forth in a labor agreement between IUPAT District Council 5 and NWCCA.

## I.    PARTIES

1.1     Northwest Wall & Ceiling Contractors Association ("NWCCA") is an association of contractors ("Employers") who work throughout Western Washington.  NWCCA's principal place of business is in Seattle, WA. NWCCA and the NWCCA Employers are involved in an industry affecting interstate commerce. The NWCCA Employers were a party to the arbitration that is the subject of this Complaint;

1.1.1   Alliance Partition Systems' principal place of business is in Arlington, Washington;

1.1.2   Anning-Johnson Company's principal place of business is in Redmond, Washington;

1.1.3   D.L. Henricksen, Co. Inc.'s principal place of business is in Tacoma, Washington;

1.1.4   Enderis Company, Inc.'s principal place of business is in Seattle, Washington;

1.1.5   Expert Drywall, Inc.'s principal place of business is in Redmond, Washington;

1.1.6   Firstline Systems Inc.'s principal place of business is in Kirkland, Washington;

1.1.7   Gordon Brown Assoc., Inc.'s principal place of business is in Kent, Washington;

1.1.8   KHS&S Contractors' principal place of business is in Kent, Washington;

1.1.9   Mehrer Drywall, Inc.'s principal place of business is in Seattle, Washington;

COMPLAINT AND PETITION TO VACATE
ARBITRATION AWARD - 2

18 WEST MERCER ST., STE. 400    **BARNARD**
SEATTLE, WASHINGTON 98119    **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132    **LAVITT LLP**

1.1.10  Miller & Sons' principal place of business is in Olympia, Washington;

1.1.11  Nelson Construction Co.'s principal place of business is in Auburn, Washington;

1.1.12  Northwest Partitions, Inc.'s principal place of business is in Woodinville, Washington;

1.1.13  Olympic Interiors, Inc.'s principal place of business is in Federal Way, Washington;

1.1.14  Partition Systems Inc.'s principal place of business is in Monroe, Washington;

1.1.15  Vanderlip & Company, Inc.'s principal place of business is in Redmond, Washington;

1.1.16  Western Partitions, Inc's principal place of business is in Sumner, Washington.

1.2      IUPAT District Council 5 is a labor union that represents tradespeople working in industries including industrial and commercial painting, drywall finishing, glazing and glass work, sign and display, floor covering installation, and more. IUPAT District Council 5 maintains its principle office in Seattle, WA. Members of IUPAT District Council 5 work for NWCCA Employers as well as for other employers. IUPAT District Council 5 was a party to the arbitration that is the subject of this Complaint.

1.3      IUPAT District Council 5 and NWCCA Employers are parties to a single collective bargaining agreement ("CBA") effective on its terms from July 1, 2016 - June 30, 2019. NWCCA negotiated this industry labor agreement on behalf the sixteen signatory Employers. A true and correct copy of the CBA is attached to this Complaint as **Exhibit A.**

COMPLAINT AND PETITION TO VACATE
ARBITRATION AWARD - 3

18 WEST MERCER ST., STE. 400   BARNARD
SEATTLE, WASHINGTON 98119   IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132   LAVITT LLP

## II.   JURISDICTION AND VENUE

2.1    IUPAT District Council 5 files this complaint to vacate an arbitration award arising under the CBA. This Court has jurisdiction to review and vacate the arbitration award pursuant to § 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(c), and 9 U.S.C. § 10.

2.2    Venue is proper in the Western District of Washington pursuant to 29 U.S.C. § 185(a), in that this Court has jurisdiction over the parties. Venue is also appropriate in this Court pursuant to 28 U.S.C. § 1391(b), because the arbitration that gave rise to this Complaint occurred in Seattle, Washington.

## III.   FACTUAL ALLEGATIONS

3.1    Article 1, Section 1.5 of the parties' CBA, which is commonly referred to as the "most favored nation" clause, provides in pertinent part that "Any signatory contractors performing work scopes covered by this Agreement shall be required by the Union to pay an amount equal to the total employer cost package under this agreement." Article 1, Section 1.5 also provides that "In the event the Union negotiates a contract with any other contractor covering work scopes in this Agreement … which has more favorable economic terms, then the Employers hereunder will have the benefit of any such favorable terms." *See* Exhibit A at 2.

3.2    The CBA also includes a provision that requires signatory contractors make a $0.35 contribution per compensable hour of bargaining unit work to the NWCCA's "Industry Fund." Article 19, Section 19.14, Exhibit A at 22. The Industry Fund is used to pay for the NWCAA's convention, labor negotiations, respiratory protection, hearing protecting and other safety measures, substance abuse prevention, administrative costs, and, lastly, to contribute to the Northwest Wall & Ceiling Bureau ("NWCB" or "Bureau"). The NWCB in turn is a non-profit

COMPLAINT AND PETITION TO VACATE
ARBITRATION AWARD - 4

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

1  trade association for the wall and ceiling industry that provides resources and services to all

2  industry members.

3        3.3      Performance Contracting Incorporated ("PCI"), one of the largest contractors in

4  the wall and ceiling industry in western Washington, withdrew its membership from NWCAA

5  prior to the completion of the 2016-2019 CBA and is not a signatory to the CBA.

6        3.4      PCI did not believe that the NWCCA industry fund was benefiting the wall and

7  ceiling industry as a whole, and it believed that smaller employers were benefitting at PCI's

8  expense.

9        3.5      After NWCCA and IUPAT District Council 5 negotiated the 2016-2019 CBA,

10  IUPAT District Council 5 and PCI bargained and executed their own labor agreement. This

11  agreement is nearly identical to the NCWAA CBA and includes a requirement that PCI

12  contribute $0.35 per compensable hour of bargaining unit work to an industry fund operated by

13  PCI ("PCI industry fund").

14        3.6      On October 11, 2016, the NWCCA Employers filed a grievance against IUPAT

15  District Council 5 alleging that the Union violated Article 1, Section 1.5 of the CBA, attached

16  hereto as **Exhibit B**. NWCCA alleged that by entering into its agreement with PCI, the Union

17  extended more favorable economic terms to NWCCA's competitor. NWCCA's allegation was

18  based on the fact that PCI administered its own industry fund, asserting the Union "has violated

19  its commitment in Section 1.5 of [the CBA] to require any non-signatory contractors performing

20  work covered by [the CBA] to pay an amount equal to the total Employer cost package under

21  [the CBA]." Exhibit A at Article 1.5.

22        3.7      IUPAT District Council 5 denied that it had extended more favorable economic

23  terms to PCI.  IUPAT District Council 5 also denied that PCI was a "signatory contractor" so as

24

COMPLAINT AND PETITION TO VACATE
ARBITRATION AWARD - 5

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

to fall within the scope of the last sentence of Section 1.5.

3.8     The Union nevertheless, consistent with the express "remedy" language of Section 1.5, offered to all NWCCA Employers the benefit of the allegedly more favorable terms it had negotiated with PCI.  Specifically, the Union offered to permit each NWCCA Employer the right to create and fund its own self-administered industry fund.  IUPAT District Council 5 extended this offer on multiple occasions, including both verbally and in writing. NWCCA and the NWCCA Employers did not respond to this offer, and the NWCCA Employers did not accept it.

3.9     When the parties were unable to resolve the NWCCA Employers' grievance, the NWCCA requested arbitration under Article 6 of the CBA.

3.10    The Arbitrator held a hearing on August 10, 2018.

3.11    The parties submitted post-hearing briefs in this matter to the Arbitrator on September 14, 2018.

3.12    On November 5, 2018, the Arbitrator issued an Opinion and Award ("the Award"). A true and correct copy of the Award is attached to this Complaint as **Exhibit C.**

3.13    The Arbitrator defined the issue as the following:

>     1.    Did the IUPAT District Council 5 violate Article 1.5, the most favored nations clause, of the Parties 2016-19 collective bargaining agreement by the terms of a separate agreement it signed with Performance Contracting Incorporated?
>
>     2.    If so, what is the appropriate remedy?

Exhibit C at 8.

3.14    The Arbitrator determined that even though PCI was not a signatory to the NCWAA collective bargaining agreement, the Union was nevertheless bound to ensure that PCI paid an amount equal to the total employer cost package under Article 1, Section 1.5, which

COMPLAINT AND PETITION TO VACATE
ARBITRATION AWARD - 6

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

states "Any signatory contractors performing work scopes covered by this Agreement shall be required by the Union to pay an amount equal to the total employer cost package under this agreement." *Id.* at 20.

3.15    The Arbitrator did *not* conclude that the Union violated Article 1, Section 1.5 "by the terms of [the] separate agreement it signed with Performance Contracting Incorporated." However, the Arbitrator concluded that because PCI had not spent the PCI industry funds to support promotional activities related to the Drywall Finishing Industry, PCI gained an economic advantage. *Id.* at 36.  The Arbitrator concluded that the Union breached its obligations by failing to ensure "the level economic field required by Article 1.5."  *Id.* at 38-39.

3.16    The Arbitrator also found that IUPAT District Council 5 *did,* consistent with the express "remedy" language of Article 1, Section 1.5, offer to provide all NWCCA Employers the benefit of the allegedly more favorable terms it had negotiated with PCI.  Specifically, the Union offered to permit each NWCCA Employer the right to create and fund its own self-administered industry fund.  The Arbitrator concluded:

> The evidence is clear that both orally and in writing the Union offered to provide to the signatory contractors the exact same right that was extended to PCI (set up your own industry fund and make your contribution to it).

*Id.* at 37 (footnote omitted).

3.17    Notwithstanding that factual finding, which compelled the conclusion that the express remedy provision of Article 1, Section 1.5, had been satisfied by IUPAT District Council 5 (i.e., "the Employers hereunder" having been offered "the benefit of any such favorable terms"), the Arbitrator imposed liability on the Union in the amount of $0.15 per compensable hour for every hour worked for PCI for the entire term of the 2016-2019 NWCCA CBA.  *Id.* at 45-46. The arbitrator calculated this by multiplying $0.35 per compensable hour (the amount in

COMPLAINT AND PETITION TO VACATE
ARBITRATION AWARD - 7

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

the NWCCA CBA that was to go to NCWAA's industry fund) by 42.8% (the percentage of the industry fund that the Arbitrator found "goes to the NWCB"). *Id.* at 45. The arbitrator explained that "had PCI submitted $0.15 per compensable hour to NWCB or some other industry wide benefit it would not have been disproportionately advantaged from its self-administered industry fund." *Id.* at 46.

3.18    The Arbitrator directed the Union to have PCI pay the award directly to NWCB, "but in the event that PCI fails to provide all of this compensation, the Union stands liable." *Id.* at 46. Consistent with this directive, the Union asked PCI to pay the award to NWCB, but PCI did not agree to do so.

3.19    The Arbitrator's Award exceeded his authority, fails to draw its essence from the parties' CBA, and the Arbitrator dispensed his own brand of industrial justice in a number of ways, including but not limited to the following:

    3.19.1  The Arbitrator's Award replaced the unambiguous remedy for a violation of the most favored nation clause provide in the CBA (that NWCCA Employers would have to be offered "the benefit of any such [more] favorable terms" provided to a non-signatory employer by the Union) with a non-contractual remedy of his own devising.

    3.19.2  The Arbitrator premised the Union's liability not on the act complained of in the grievance, signing a CBA with PCI that allowed PCI to create its own industry fund, but on the Union's alleged failure to enforce its agreement with PCI, an act that is not addressed by the NWCCA CBA.

COMPLAINT AND PETITION TO VACATE
ARBITRATION AWARD - 8

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

3.19.3  The Arbitrator imposed economic liability on the Union for violating the most favored nation clause even though he found that the contract signed with PCI did not constitute a violation of the most favored nation clause.

3.19.4  The Arbitrator imposed economic liability on the Union premised on the failure of a third party (PCI) to take action (i.e., PCI's alleged failure to spend its industry fund in a way consistent with the PCI CBA), an occurrence wholly outside the union's control or, at best, an occurrence the Union could only have attempted to enforce through the PCI CBA, which enforcement efforts might or might not have been successful.

3.19.5  The Arbitrator's Award imposed economic liability on the Union for failing to "vigorously enforce" an agreement (the MOU between PCI and the Union) over which the arbitrator had no authority.

3.19.6  The Arbitrator imposed economic liability on the Union premised on the failure of a third party (PCI) to take action *after* the Award, i.e., make certain financial payments to the NWCB, that the Union had no power to compel.

## IV.    GROUNDS FOR RELIEF

4.1    IUPAT District Council 5 incorporates by reference paragraphs 1.1 through 3.19.6 above, as if fully set forth herein.

4.2    The Arbitrator exceeded the authority granted him by the CBA, failed to draw the essence of his award from the CBA, and dispensed his own brand of industrial justice when he ignored the plain language of Article 1, Section 1.5 and created his own remedy contrary to the remedy provided in the most favored nation clause.

18 WEST MERCER ST., STE. 400   BARNARD

SEATTLE, WASHINGTON 98119   IGLITZIN &

TEL 800.238.4231 | FAX 206.378.4132   LAVITT LLP

4.3     The Arbitrator exceeded the authority granted him by the CBA, failed to draw the essence of his award from the CBA, and dispensed his own brand of industrial justice when he premised the Union's liability on an act or acts not complained of in the grievance.

4.4     The Arbitrator exceeded the authority granted him by the CBA, failed to draw the essence of his award from the CBA, and dispensed his own brand of industrial justice when he imposed economic liability on the Union for violating the most favored nation clause, despite holding that the Union did not violate the most favored nation clause when it signed a CBA with PCI that allowed PCI to create its own industry fund.

4.5     The Arbitrator exceeded the authority granted him by the CBA, failed to draw the essence of his award from the CBA, and dispensed his own brand of industrial justice when he imposed a remedy on the Union for failing to "vigorously enforce" a collective bargaining agreement over which the Arbitrator had no authority.

4.6     The Award should be vacated in its entirety.

### V.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.     An order vacating the Arbitrator's Award, discussed above; and

2.     For such other relief as the Court may deem just and proper.

RESPECTFULLY SUBMITTED this 31st day of January, 2019.

s/Dmitri Iglitzin
Dmitri Iglitzin, WSBA No. 17673
s/Sarah Derry
Sarah Derry, WSBA No. 47189
BARNARD IGLITZIN & LAVITT LLP
18 W Mercer St, Suite 400
Seattle, WA 98119
(206) 257-6003
iglitzin@workerlaw.com
derry@workerlaw.com

COMPLAINT AND PETITION TO VACATE
ARBITRATION AWARD - 10

18 WEST MERCER ST., STE. 400   BARNARD
SEATTLE, WASHINGTON 98119   IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132   LAVITT LLP

Exhibit A

# IUPAT DISTRICT COUNCIL 5

## WESTERN WASHINGTON AREA AGREEMENT

## FOR THE

## DRYWALL FINISHING INDUSTRY



## July 1, 2016 – June 30, 2019



# TABLE OF CONTENTS

ARTICLE  1.  PREAMBLE & PURPOSE ............................... 1
ARTICLE  2.  SCOPE OF AGREEMENT............................... 2
ARTICLE  3.  RECOGNITION & BARGAINING UNIT................... 3
ARTICLE  4.  DEFINITIONS ........................................ 3
ARTICLE  5.  RIGHTS OF THE PARTIES ............................. 4
ARTICLE  6.  GRIEVANCE PROCEDURE ............................. 4
             LABOR-MANAGEMENT BOARD ........................ 4
ARTICLE  7.  UNION SECURITY .................................... 6
ARTICLE  8.  PROTECTION OF RIGHTS ............................. 7
ARTICLE  9.  SAFETY ............................................. 8
ARTICLE  10. PIECE WORK PROHIBITION .......................... 8
ARTICLE  11. EMPLOYER RESPONSIBILITES ........................ 9
ARTICLE  12. EMPLOYMENT OF EMPLOYEES ....................... 10
ARTICLE  13. JOB STEWARDS ..................................... 13
ARTICLE  14. DRYWALL TAPER APPRENTICE ...................... 13
ARTICLE  15. HOURS OF WORK & WORK RULES.................... 14
ARTICLE  16. TRAVEL PAY & SUBSISTENCE........................ 17
ARTICLE  17. OUT OF AREA WORK ................................ 19
ARTICLE  18. OVERTIME PERMIT ................................. 19
ARTICLE  19. WAGES & CLASSIFICATION........................... 20
ARTICLE  20. JOURNEY LEVEL EDUCATION OPPORTUNITIES ........ 23
ARTICLE  21. TRUSTS ............................................ 23
ARTICLE  22. TRUST FUNDS BENEFIT LEVELS ...................... 25
ARTICLE  23. IUPAT PENSION .................................... 27
ARTICLE  24. SEPARABILITY ...................................... 28
ARTICLE  25. SEATTLE SICK LEAVE WAIVER ...................... 29
ARTICLE  26. DURATION OF AGREEMENT........................... 29
             ADDENDUM "A"– RESIDENTIAL
             ADDENDUM "B" – PRE-APPRENTICES
             DRYWALL FINISHERS REQUIRED TOOL LIST
             SIGNATURE PAGE



## ARTICLE 1
## PREAMBLE & PURPOSE

1.1   This Agreement is a successor Agreement to the Western Washington Area Agreement for the Drywall Industry, which was effective from July 1, 2013 to June 30, 2016. This Agreement is between International Union of Painters & Allied Trades (IUPAT) District Council 5 ("Union") and Employers as defined herein and those who are signatory to this Agreement. The parties recognize that the Northwest Wall and Ceiling Contractors Association (hereinafter referred to as "NWCCA") acted as a negotiator for certain Employers during negotiations preceding execution of this Agreement, but that the NWCCA is not itself signatory to this Agreement.

This Agreement shall be binding on the Union and upon all Employers who have employed or shall, during the period of this Agreement, employ workers represented by the Union and who have (i) signed this Agreement, or (2) expressly or impliedly authorized some other person to sign on such Employer's behalf and (3) requested and accepted referral of one (l) or more workers from the Union.

This Agreement shall be effective in the following Counties of Western Washington: Whatcom, Thurston, Snohomish, Skagit, San Juan, Pierce, Mason, Kitsap, King, Jefferson, Island, Grays Harbor, Clallam, and Lewis.

1.2   The NWCCA, and independent Employers who are parties to this Agreement, recognize the Union as the exclusive bargaining agent for the purpose of collective bargaining on behalf of all employees engaged in drywall work.

1.3   The purpose of the Agreement is to establish harmonious relations and uniform conditions of employment and contributions to the Trust Plans between the parties hereto, to promote the settlement of labor disagreements by conference and arbitration, to prevent strikes and lockouts, to utilize more fully the facilities of the Apprenticeship Training Program, to promote efficiency and economy in the performance of drywall finishing, etc., and generally to encourage a spirit of helpful cooperation between the Employer  and employee group to their mutual advantage and the protection of the investing public.

1.4   When, in the opinion of any party to this Agreement, certain work might be secured for Contractors signatory to this Agreement, and the present terms and conditions of work contained in this Agreement are not consistent with efficiency or practicality or the competitive position of the Contractors, then the terms and conditions contained in this Agreement may be modified to govern such project, geographical area or type of work. The consent, in writing, of the Union shall be required to modify said terms and conditions. Any special agreement will be recorded in the records of the Labor Management Committee and will be made available to all Contractors upon request.





1.5   The parties to this Agreement recognize the Exterior and Interior Industry as a Specialty Market and the necessity of assuring the competitive position of the parties within the Exterior and Interior Industry during the term of this Agreement. In the event the Union negotiates a contract with any other contractor covering work scopes in this Agreement as defined in Article 2 (Scope of the Agreement) (excluding any Residential Agreement, Single/Special Project Agreement, Market Recovery Program funded projects and District Council 5 Maintenance Agreements) which has more favorable economic terms, then the Employers hereunder will have the benefit of any such favorable terms. Any signatory contractors performing work scopes covered by this Agreement shall be required by the Union to pay an amount equal to the total employer cost package under this agreement.

## ARTICLE 2
## SCOPE OF AGREEMENT

2.1   Drywall work as that term is used in this Agreement includes but is not limited to the following:  All steps to execution of drywall finishing, spackling of all surfaces and application of texture finishes where adhesive materials are used, thin wall, radiant heat fill and all preparatory work of spotting, taping, finishing and sanding of joints and surfaces.  Drywall work also includes the handling of all preparatory work incidental to drywall finishing of any surfaces.  The grouting and caulking of door jambs, caulking between sheetrock walls and/or ceilings and adjoining walls, ceilings, and floors of other material, spray fireproofing, firestopping, application of exterior insulation and/or finishes, flushing of concrete, steel, wood, or plaster surfaces and all other work which is usually executed by Drywall Tapers and Finishers; and the operation and care on the job site of all tools and equipment used by all trades coming under the jurisdiction of the International Union of Painters and Allied Trades.

2.2   Drywall work also includes work, materials, equipment or processes that are substituted for the matters covered in Section 1 of this Article.

2.3   Painting work is as defined in the constitution of the International Union of Painters and Allied Trades, AFL-CIO; the National Joint Board decisions of record, and local area customs and practices.

2.4   This Agreement applies to drywall work to be done at the site of construction, alteration, painting, or repair of a building, maintenance, or other work.  These terms are to be interpreted and applied in accordance with the National Labor Relations Act, as amended.

2.5   No limitations shall be placed on the work covered by this Agreement by reason of the surface, type of materials, or purpose for which the materials used are designed or intended.





## ARTICLE 3
## RECOGNITION & BARGAINING UNIT

3.1 If at any time during the term of this Agreement, the Union shows proof, or offers to show proof, that a majority of the Employer's employees covered by the labor agreement support the Union and have authorized the Union to serve as their collective bargaining representative, the Employer will immediately (within five days) recognize the Union under Section 9(a) of the National Labor Relations Act as the sole and exclusive bargaining representative of all employees within the craft and geographical scope of the labor agreement.

3.2 The Union, and all independent Contractors who have agreed to abide by the wages, hours, terms and conditions of employment set forth in this Agreement do hereby agree to establish and recognize a single Employer collective bargaining unit for each signatory Employer. The Union recognizes the Employer's designated representative as the authorized bargaining agent for those Employers in the Drywall and Painting Industry operating within the territorial area covered by this Agreement for the type of work covered by this Agreement who have or hereafter sign this Agreement.

    3.2.1 Employers covered by this Agreement shall be free to designate their own representative for the purpose of collective bargaining; however, such designation shall not affect the Employer's right or obligation to make Trust or Fund contributions required by this Agreement.

## ARTICLE 4
## DEFINITIONS

4.1 The term "Employer" refers to any person who has agreed, in writing, to comply with the terms of this Agreement and includes any person acting as an agent of the Employer, directly or indirectly. The term "person" includes one or more individuals, partnerships, associations, corporations, joint ventures, legal representatives, trustees, trustees in bankruptcy or receivers.

4.2 The term "Drywall Finisher" and/or "Taper" as used in this Agreement (previously referred to as Journeyman) means persons qualified in the industry who have completed an apprenticeship program or have passed the necessary examinations as to proficiency as a mechanic to perform the duties pertaining to the Drywall Industry as an employee, and who do not contract.

4.3 The term "Apprentice", as used in this Agreement, means persons who are learning the Drywall trade who have been accepted by the local Painting, Decorating and Drywall Joint Apprenticeship and Training Committee and are registered with the Washington State Apprenticeship Council.

4.4 The term "employee", as used in this Agreement, means persons formerly referred to as Journey worker or Drywall Finisher and/or Taper Apprentice as defined in this Article.



*IUPAT DC 5 Western Washington Area Agreement for the Drywall Industry*
*July 1, 2016 - June 30, 2019*



## ARTICLE 5
### RIGHTS OF THE PARTIES

5.1   The Union retains all rights except as those rights are limited by the express and specific language of this written Agreement.   Nothing anywhere in this Agreement shall be construed to impair the right of the Union to conduct its affairs in all particulars except as expressly and specifically modified by the express and specific language of this written Agreement. It is further agreed that nothing contained in this Agreement shall be construed as limiting the Union's right to control its internal affairs and discipline its members who have violated the Union's Constitution and Bylaws, or who have violated the terms of this Agreement, or who have crossed or worked behind an IUPAT District Council 5, its affiliated or its affiliations authorized primary picket line, including but not limited to such a picket line at the Employer's premises or job site where the Employer is engaged in  drywall work. This Section is not intended and shall not be construed to authorize any conduct that is proscribed by the National Labor Relations Act.

It shall not be a violation of this Agreement if the Union advises Drywall Tapers or Painters to exercise rights conferred by this Agreement or provided by law.

5.2   Except as specifically limited by this Agreement, the Employer shall have exclusive rights to manage his business, to control and supervise all operations and direct all working forces, including, but not limited to, the right to select and hire, discharge (with or without cause), promote, transfer, or schedule employees, to control and regulate the use of all equipment, materials, tools and other property of the Employer and to maintain efficiency among his employees.

5.3   Liability clause:  The parties hereto agree that an act of a member of the Union shall not be binding on the Union unless such an act is expressly authorized by said Union.

## ARTICLE 6
### GRIEVANCE PROCEDURE / LABOR - MANAGEMENT BOARD

6.1   Except as expressly otherwise provided in this Agreement, there shall be no strike or lockout on any job over any grievance or dispute between the Union or the Employer and all grievances or disputes between the Union and the Employer, arising during the  terms of this Agreement, shall be settled in accordance with the provisions of this Article.  The terms grievance or dispute include but are not limited to differences concerning the interpretation and application of this Agreement.

6.2   There shall be established a Labor-Management Board composed of three (3) members from Labor and three (3) members from the NWCCA selected by their respective parent bodies.  This board may interpret the intent of the negotiations of the Agreement, act as the grievance committee, establish procedural and record keeping guidelines for its operation and promote the industry.   The Labor-Management Board is authorized to mutually agree to make modification to this Agreement as necessary.   Any majority decision by the Board shall be final and binding on all parties and employees.



4



6.3   In the event a grievance or dispute arises, representatives of the Union shall attempt to settle the grievance or dispute by contacting the Employer involved within 10 working days of knowledge of the event or from when the grievant should have known of the event but in no event longer than 45 working days from the actual event giving rise to the grievance. In the event the grievance or dispute is not resolved, either the Union or the Employer is authorized to refer the grievance or dispute to the Labor-Management Board. Working days shall be defined as Monday through Friday excluding the listed holidays.

6.4   The Labor-Management Board shall act as the Grievance Committee. If a member of the Board is involved in the grievance or dispute, then an alternate member shall be chosen from their respective group with the decision of the board becoming final and binding upon all parties. The hearing shall be held in Seattle, Washington or in a place mutually agreed to. Four (4) members of the Board, two from Management and two from Labor, shall constitute a quorum to hear each dispute or grievance and voting will be by secret ballot. The Board shall endeavor to meet within ten (10) working days of the date to the matter is referred to it. If the grievance or dispute is not resolved in this manner within ten (10) working days, or if a deadlock exists within the Committee, either the NWCCA, the Employer or the Union is authorized to refer the matter to arbitration, if advanced in writing by the filing party within thirty (30) calendar days from that date.

6.5   If the parties cannot agree on an arbiter, the party requesting arbitration is authorized to request the American Arbitration Society or the Federal Mediation and Conciliation Service to submit a list of nine (9) names of Northwest Arbitrators, and the Union and the NWCCA shall alternately strike eight (8) names from the list. The remaining name shall be the arbitrator. The arbitrator chosen will be authorized to hear the dispute or grievance submitted to him and his decision shall be final and binding. The arbitrator's fee shall be paid by the party who loses the case. The impartial umpire may, in his discretion, allocate the fee between the Union and the Employer or NWCCA if he believes that the Union, the Employer, nor the NWCCA substantially prevailed.

6.6   In the event the Union claims that an Employer has violated any of the trust contributions provisions of this Agreement, the Union shall be permitted to take economic action against such Employer. If such Employer deposits a certified check in the amount claimed by the Union to be due, made payable to the Union, with a local bank and gives the Union notice that this has been done, the Union shall be required to refrain from further economic action and to submit the matter to the Labor-Management Board and the procedure under Section 4 of this Article shall apply. In the event the Union takes economic action pursuant to this Section, the Employer shall be liable for up to two days lost wages and trust payments on wages sustained by his employees.





6.7   No claim for back pay, travel time, overtime, or any pay due and payable each week will be considered if filed later than 14 days. However, this shall not preclude the right to hear any complaints during the terms of this Agreement wherein the evidence indicates a condition of chronic or continual violation or to take such remedial action as the situation may demand consistent with the intent and purpose of this Agreement.   To be valid, a grievance must be filed within 10 working days of the occurrence or knowledge of the event but in no event later than 45 working days from the actual event.   Working days are Monday through Friday not counting any listed holidays.

## ARTICLE 7
## UNION SECURITY

7.1   All employees of any Employer covered by this Agreement who are members of the Union on the date of execution of this Agreement shall be required by the Employer to maintain their membership as a condition of employment.  All employees who are not members of the Union on the date of execution of this Agreement and all employees employed after the execution date of this Agreement shall, on and after the eighth day following the date of employment, whichever is later, be required by the Employer to become and remain members of the Union as a condition of employment.

7.2   It is understood and agreed that all parties to this Agreement have agreed to form and be a part of a single collective bargaining unit composed of all Employers and Unions who are bound by the terms of this Agreement. Accordingly, an employee who is not a member of a signatory Union at the time of his initial employment, will be granted only one eight (8) day grace period during the life of this Contract.

7.3   In the event that a worker fails to tender the Administrative Processing Fee or that a member of the Union fails to maintain their membership in accordance with the provisions of this Article, the Union shall notify the Employer, in writing, and such notice shall constitute a request to the Employer to discharge said individual worker within 48 hours (Saturdays, Sundays and holidays excluded) or the Employer will be liable for Union dues and fees.

7.4   The Union agrees to hold the Employer harmless in any case where the Employer has complied with the written instruction of the Union in accordance with Section 3 above and the Employer has complied with Article 12 "Employment of Employees".

7.5   The Union shall have the right to withdraw its' members during working hours for picket duty assigned to such member, providing it does not work a hardship upon the Employer.   The Union agrees to notify the Employer twenty-four (24) hours in advance.





## ARTICLE 8
## PROTECTION OF RIGHTS

8.1  Picket Line:  It shall not be a violation of this Agreement and it shall not be cause for discharge, discipline or permanent replacement for any employee covered by this Agreement to refuse to cross or work behind any primary picket line. It shall not be a violation of this Agreement, and it shall not be cause for discharge, transfer or disciplinary action, if any employee refuses to perform any service that his or her Employer undertakes to perform for an Employer or person whose employees are on strike.

8.2  Subcontracting: The Employer shall not subcontract or otherwise transfer in whole or in part any drywall and/or any other work performed by members of the IUPAT to be done at the site of the construction, alteration, painting or repair of a building, structure or other work unless the person, firm, partnership, joint venture, corporation or other business entity to whom the work is subcontracted or transferred has signed a Collective Bargaining Agreement with IUPAT District Council 5.

8.3  This Agreement shall apply to all work within the trade jurisdiction of the Union and performed by Drywall Finishers, Tapers, and/or Painters.  The bargaining unit shall consist of all Drywall Finishers and/or Tapers and Apprentice classifications contained in schedule "A" and Painter classification set forth in Schedule "B", and the Employers recognize the Union as the sole and exclusive representative for all Drywall Finishers and/or Tapers, Apprentices and Painters employed by the Employers for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment and fringe benefits, or other conditions of employment.  Only the employees in the bargaining unit shall perform the work covered by this Agreement.

8.4  It is the intent of the Employer and the Union to protect all job site work which has been traditionally performed by the bargaining unit employees or which is claimable as bargaining unit work.

8.5  The Union agrees to cooperate with the individual Employers in achieving maximum efficiency and productivity and to work with management and individual Employers to eliminate inefficiency, work stoppages and production limitations.  It shall be considered to be contrary to the purposes and intent of this Agreement for any Journey worker or Apprentice to work for other Employers after their regular day's employment with one Employer, or for any Journey worker or Apprentice to take jobs on their own and on behalf of their own selves after regular hours of employment or during weekends, holidays and vacations, except as part of an organizing drive.  Any employee violating this section may be terminated.

8.6  Work Covered: This Agreement covers all drywall and/or painting work which has been historically performed by members of the bargaining unit and all work which is fairly claimable by such members.



7



8.7    Evasion Prohibited: The Employer shall not directly perform, undertake or accomplish or attempt directly or indirectly to perform, undertake or accomplish any drywall and/or painting work except in complete compliance with all terms and provisions of this Agreement.

## ARTICLE 9
## SAFETY

9.1    The Employer agrees that no employee will be allowed to use any poisonous materials injurious to the health such as wood alcohol, coal tar products, benzol varnish remover, toxic materials and paint with heavy lead content or to perform the sanding of other dangerous materials, unless they are protected by every modern device and method used for health protection.

9.2    The safety standards for construction work, the General Safety and Health Standards published by the Washington State Health Department of Labor and Industries and Federal Occupational Safety and Health Act of 1970, and amendments thereof shall be a part of this Agreement.

9.3    Both Labor and Management agree that both the Employer and the employees will abide by all the safety rules, including first aid cards, and regulations as stated in Section 2.

9.4    The parties signatory to this agreement agree to a substance abuse policy known as the Northwest Wall and Ceiling Industry Drug Free Card Program. No employer signatory to this agreement shall be required to participate in the Northwest Wall and Ceiling program if they so choose.

9.5    It is agreed that the Employer may return an injured employee to light duty status when allowed by the employee's doctor, per state law.

9.6    The Employer agrees to insure that an adequate source of potable drinking water is on all job sites.

## ARTICLE 10
## PIECE WORK PROHIBITION

10.1    Any employee covered by this Agreement who enters into any arrangement (other than that described in Addendum A) - expressed or implied, direct or indirect with an Employer which contemplates any form of compensation (other than hourly wages as provided for in this Agreement) shall be terminated by the Employer and shall not be re-employed by such Employer during the term of this Agreement. In addition to any and all rights conferred either by law or by the terms of this Agreement, the Union shall have the right to picket or strike or both, any Employer who enters into an arrangement prohibited by this Article or who fails or refuses to terminate any employee who has entered into such an arrangement. The Union shall also have the right to terminate the Contract of such Employer.

10.2    Trust Fund contributions shall be based on actual hours worked.





8

## ARTICLE 11
## EMPLOYER RESPONSIBILITIES

11.1   The following requirements shall be applicable to all Employers who are parties to this Agreement:

a.   Every Employer, bound by this Agreement, is required to notify the Union, in writing, by certified mail, within thirty (30) days after any change in ownership. If such notice is not given, the Employer shall be liable for all losses sustained within the thirty (30) calendar days following such change in ownership.

b.   This Agreement shall apply to all present and subsequently acquired operations of the Employer that performs work covered by this Agreement and shall be an accretion to the Bargaining Union, including but not limited to newly established or acquired business.

c.   The Employer shall not require any employee covered by this Agreement to report at the job site or in the shop more than thirty (30) minutes before working time.

d.   In the event the Employer, or any principal involved with the Employer establishes a branch of its business, or a subsidiary, or merges with, consolidates with, or acquires or establishes a separate business entity within the geographical jurisdiction of this Agreement, then the terms and conditions of this Agreement shall apply to such branch, subsidiary, merged, consolidated or acquired facility and/or business in the event it performs any work covered by the terms of this Agreement.

e.   The Employer agrees that on work performed coming under the scope of this Agreement where plans or specifications have been provided by an awarding authority said specifications shall be available for inspection by the representative of the Union and/or District Council.

f.   When Employers indicate a desire to perform work coming under the scope of this Agreement, they will be required to show to the satisfaction of the Union that they have equipment for the work. They shall also be required to hire one Taper who shall act as Supervisor at all times. Said Supervisor shall be the first employee employed by the general or building Contractor and shall receive nine percent (9%) per hour over and above Journey level pay. The Contractor shall be required to pay all fringe benefits as specified in the Agreement. All such Agreements shall be filed with the Trust offices who in turn shall accept trust contributions from such Employers. The Employer shall at all times be free to select its supervisors without recrimination by the Union against the Employer or Supervisor for acting in the interest of the Employer.

g.   The following information shall be required when an Agreement is signed: Washington State Contractors Registration number and the bond required by this Agreement. The Employer may also be required to provide evidence of an acceptable bookkeeping system or accounting facilities including proper time cards for all employees, and suitable payroll check stubs and other records required by law. The Union will provide copies of this information to the NWCCA.





h.  In the event any Employer, bound by this Agreement, terminates its' drywall and/or painting business, such Employer shall not be permitted to assign or transfer this Agreement without the written consent of the Union. A change in the Employer's business structure (e.g. proprietorship to corporation) or mode of doing business shall not justify noncompliance with this Agreement.

i.  Employer party hereto shall not use any corporation or other operation device for the purpose of violating his obligations under this Agreement.

## ARTICLE 12
## EMPLOYMENT OF EMPLOYEES

12.1  a.  Except as specifically limited by this Agreement, the Employers shall have entire freedom of selectivity in hiring and may discharge any employees for any cause that they may deem sufficient.

b.  It shall be the responsibility of the Union to dispatch qualified and competent workers.

1.  Whenever the Employer requests a worker by name to a particular job, the worker/employee shall be responsible to obtain a dispatch slip from the Union which includes wages, benefits, travel or other compensation applicable to the job. Dispatch slips may be faxed directly to the Employer's office. The Union and Employer reserve the right to correct any inaccurate dispatch. A corrected dispatch shall not result in a liability for an Employer of more than twenty-one (21) calendar days prior to correction.

2.  When a member arrives at the hall for a dispatch slip, the union will remind all potential dispatchees to be prepared to present I-9 documentation upon reporting to work. I-9 documentation forms will be available at the union hall upon request.   All employees shall comply with State and Federal requirements for employment.

c.  New workers to the Local who claim to have a certain degree of skill shall be dispatched with notice to the Employer as to how this worker was rated and accepted into the Union. Within the first week of employment the Employer will evaluate the Tapers skill and ability. If the Employer notifies the Union that the Taper is not, in his opinion, a Journey level worker, the Taper will be re-evaluated and offered the opportunity to enter the Apprenticeship program at a level commensurate with his or her skills. In the event direct entry should become limited for any reason the parties shall agree to a replacement provision within 60 days of a request for such replacement.

d.  As a condition of employment employees shall be required to possess a current scaffold user certification, scissor/boom lift certification, fall protection certification, OSHA 10 or OSHA 30 certification and current CPR/First Aid certification. Labor and management agree to meet to discuss trade related curriculum that will be sponsored by the JATC and made available to Journey level Drywall Finishers.




10

e. The Employer agrees not to discriminate against employees because of age. The Employer agrees to cooperate with the Union in finding suitable employment for employees over 50 years of age.

12.2 Painters, Tapers, and Apprentices will be hired in the manner set forth in this Article. Each Local party to this Agreement will maintain separate hiring halls. Hiring halls will be operated on an open and nondiscriminatory basis for employment, of this particular trade, including Painters and/or Tapers or indentured Apprentices, previously employed by Employers in the multi-Employer unit included in this Agreement and non-member workers who may make application for a place on the appropriate out-of-work list.

12.3 When an Employer desires to hire Painters, Tapers, or Apprentices a request shall be made to the Local that has jurisdiction over the job. If the order is not filled within twenty-four (24) hours the Employer can hire from any source. The Employer shall report the name, address and social security number of any employee hired outside the hiring hall to the Local having jurisdiction over the job within forty-eight (48) hours after the employee begins work. Under no circumstances will any worker be employed by any Employer for work covered under this Agreement unless said worker has been properly dispatched by referral slip from the Local Union Office.

12.4 Separate out-of-work lists will be maintained for Painters, Tapers, Painters Apprentices and Taper Apprentices. The Painter and Taper lists will be divided into three (3) parts: "A", "B" and "C". The "A" list will consist of applicants who have two or more consecutive years work in the bargaining unit. The "B" list will consist of applicants who have three or more years work at the trade. The "C" list will consist of all other applicants. A year means one thousand (1,000) hours work within a calendar year. Health and Welfare reports will control for purpose of the "A" list. Applicants seeking registration on the "B" list have the burden of proving required experience. "B" list applicants shall be entitled to register on the "A" list after proving twenty-four (24) months residency in the local area and having been registered on that Local Union's "B" list for twenty-four (24) months. Unemployed applicants may register in any Local Union covered by this Agreement; however, no applicant shall register in more than one (l) Local Union at any time. Any applicant who registers on the out-of- work lists maintained by any of the Locals party to this Agreement will be removed from such lists and required to re-register if said applicant is registered in more than one (l) Local Union at any time. All applicants must re-initial their respective list every thirty (30) days. Failure to do so will be cause for the Union to remove said applicant from the list. Effective July 1, 2011, in order to maintain status of the "A" out-of-work list, each employee shall have current certifications for First Aid/CPR, OSHA 10, and Scaffold User.

12.5 a. Upon receiving a request for Painters or Tapers, and in absence of specific request by name, by the Employer, the Union will first refer from the "A" list. A dispatch will not be issued to an otherwise qualified applicant who within the previous twelve (12) months was terminated ineligible for rehire. The Employer agrees to notify the Union, in writing, of the name or names of any former employees not eligible for rehire. It is agreed that Employer may request applicants by name.





11

Such requests will be honored by the Union if said requests are made in writing; and the applicant is registered on the "A", "B" or "C" lists. The Union shall not be required to recite the list to the Employer.

b.  Special skills and foreman requests will be recognized if "A" and "B" list applicants having such skills are available. Requests by name for special skills or foreman must be confirmed in writing within forty-eight (48) hours.

c.  An Appeals Board is hereby established consisting of two (2) members selected by the Employer and two (2) members selected by the Union and one (1) neutral member selected by the four (4) members for the sole purpose of hearing appeals brought about by an applicant who may believe that his rights to referral have been violated or infringed upon.

d.  He / she shall have the right to appeal his case before said Appeals Board, by filing a brief statement, in writing, setting forth the details of his position and forwarding the same to IUPAT District Council 5, 6770 East Marginal Way S, Bldg E, #321, Seattle, Washington 98108. IUPAT District Council 5 shall notify the other party indicated above and the Board shall meet within five (5) days after such notification. A majority decision of the Appeals Board shall be final and binding, and shall be complied with. Administration of this Section shall be by the Labor-Management Board.

12.6  a.  Employees who are working, within the geographical area covered by this Agreement for an Employer who is party to this Agreement, may be transferred from job to job any place within the area covered by this Agreement, without being dispatched to such subsequent jobs, provided however, this exception shall not apply if the employee has been laid off or terminated between jobs and provided, further, that any such employee must immediately report to the Local Union into whose jurisdiction he has been transferred. In each such case, the first two employees on the job can be from the Employer. The third employee will be from the local area. Beginning with the fourth employee, who can be from the Employer, the remainder of the employees will be 50% from the local area and 50% from the Employer. In the event employees are not available from the local area to meet these requirements, any others may be employed as needed to meet project requirements. Employers whose regular and permanent business is located outside the area covered by this Agreement shall not bring into the area covered by this Agreement more than 50% of the employees (supervisors are to be included in figuring the 50%) required to perform any job within the area covered by this Agreement.

b.  Neither the Employer nor an out-of-work list applicant shall be entitled to subvert the ratios called for in 12.6(a). Any applicant who is not a member of the Local Union, shall be required to state whether s/he is leaving the jurisdiction of his Local Union to continue in the employ of his home firm in some other jurisdiction, if such be the case, the applicant shall not be eligible for dispatch by name on the out-of-work list.



IUPAT DC 5 Western Washington Area Agreement for the Drywall Industry
July 1, 2016 – June 30, 2019

c. A member making application for Clearance Card shall be required to state whether s/he is leaving the jurisdiction of his Local Union or District Council to continue in the employ of his home firm in some other jurisdiction, if such be the case, the applicant shall not be eligible for dispatch by name off the out-of-work list.

12.7 An Affirmative Action Program to encourage the employment of minorities and women by the Employers covered under this Agreement shall be established. The Joint Apprenticeship and Training Committees will do administration.

12.8 The Employer agrees not to discriminate against employees because of race, religion, color, sex, national origin, sexual orientation, disability or veteran status.

**ARTICLE 13**
**JOB STEWARDS**

13.1 The Business Representative of the Union shall, after conferring with the Employer, have the authority to appoint a shop or job steward in any shop, or on any job, and so notify the Employer in writing of the appointment. Stewards shall not be laid-off, transferred or terminated without notification to the Business Representative of the District Council. They shall have reasonable time to perform the duties of the Steward pertaining to Union affairs. Disruptions to productivity shall be minimized.

13.2 The Business Representative shall be permitted on all jobs and in shops where employees covered by this Agreement are employed. Disruptions to productivity shall be minimized.

13.3 Employees shall not be penalized for participation in Union activities during work hours, such as political rallies, volunteer projects, etc., providing it does not put an undue hardship upon the Employer. The Union agrees to notify the Employer twenty-four (24) hours in advance.

**ARTICLE 14**
**DRYWALL TAPER APPRENTICES**

14.1 It is agreed that the program as completed by the local Joint Apprenticeship and Training Committees and approved by the Washington State Apprenticeship and Training Council is part of this Agreement. All Apprentices shall be registered with the local Joint Apprenticeship and Training Committee (JATC) and the Washington State Apprenticeship and Training Council (WSATC).

14.2 Each Employer may be required to employ one Apprentice to each five Tapers or major fraction thereof, unless their right to train Apprentices has been revoked by the local Apprenticeship and Training Committee. This shall not limit the obligation of the Employer to train Apprentices in the proper ratio to the total number of Tapers in the shop when substantial local unemployment exists in the area of the Local Union or District Council.





14.3    Apprentices shall enter into a written agreement with the Employers, an association of Employers, organization of Employers, or other responsible agencies for a period of not less than those provided by the local Joint Apprenticeship and Training Committee Standards; all in conformity with the regulations established by the Apprenticeship Council of the State of Washington and adopted by the Joint Apprenticeship and Training Committee.

14.4    Employers and members of the Unions agree that all Apprentices working in the trade shall attend Vocational School where established for training of said Apprentices, and assist in the enforcement of all rules and regulations now in effect and hereafter adopted by the local Joint Apprenticeship and Training Committee.

14.5    All Apprentices failing to attend classes where schools are established for block training sessions or nights designated, except by legitimate excuse, shall be immediately removed from their work by an authorized representative of the Union and shall not be permitted to return to said work until a hearing has been held before the local Joint Apprenticeship and Training Committee and the matter settled to the satisfaction of said Committee. The parties will request that the JATC notify the Union, the last known employer and the NWCCA whenever the JATC suspends or terminates an Apprentice from the program.

14.6    Positively no Apprentice shall be sent to out-of-town work that will interfere or prohibit an Apprentice from attending classes designated for school attendance.

14.7    Drywall Apprentices sent to jobs shall be accompanied by a Drywall Taper until said Apprentice has had six months experience at the trade.

14.8    All Apprentices and Employers subject to the terms of this Agreement shall work in strict conformity with the Federal and State Regulations and all applicable JATC standards covering drywall Apprentices.

14.9    No Apprentice shall be allowed to drop his/her apprenticeship card and take out or apply to a Local Union for a Journey worker card, unless the local Joint Apprenticeship Committee has granted permission.

14.10    An Employer seeking to hire Apprentices shall first call the Local Union for available Apprentices prior to hiring from an outside source.

## ARTICLE 15
## HOURS OF WORK & WORK RULES

15.1    a.   Eight (8) hours shall constitute a day's work; five (5) days shall constitute a week's work, Monday through Friday.  A single shift operation shall be established for a minimum of three (3) days.

b.   A single shift operation shall be restricted to the hours between 4:00 a.m. and 6:00 p.m. and eight (8) hours of continuous employment (except for meal period) shall



14



constitute a day's work Monday through Friday of each week. In the event the job is down due to weather conditions, acts of God or nature or contractual requirements of the General Contractor, Monday through Friday, then Saturday may, at the option of the Employee and if approved by the Employer, be worked as a voluntary make-up day at the straight time rate.

c. Four ten (10) hour shifts at the straight time rate may be established Monday through Thursday or Tuesday through Friday. In the event the job is down due to weather conditions, acts of God or nature or contractual requirements of the General Contractor, then Friday (when working Monday through Thursday) or Saturday (when working Tuesday through Friday) may, at the option of the Employee and if approved by the Employer be worked as a voluntary make-up day. All hours worked in excess of ten (10) hours a day or forty (40) hours a week must be compensated at the overtime rate.

d. Hours outside and/or in excess of the above shall be paid at the appropriate overtime rate. The first two (2) hours of overtime in a day, Monday through Friday for the eight (8) hour day shall be at the rate of time and one-half. Hours in excess of ten (10) hours per day shall be paid at the rate of double time. All employees shall receive a fifteen (15) minute break after three (3) hours worked as well as a thirty (30) minute break after five (5) hours.

e. No employee shall be discharged, laid off, disciplined, replaced or transferred for refusing to work a make-up day.

f. In the event of a civil emergency such as, but not limited to, earthquakes, floods, or fires, starting time of the shift may be made to fit the emergency and eight (8) hours in any twenty-four (24) hour period may be worked at straight time. In order to work such shift, mutual agreement shall be received.

g. Special Shifts: When due to conditions beyond the control of the Employer or when contract specifications require that work can only be performed outside the regular day shift, then a special shift, upon three (3) days written notice to the Union may be worked, Monday through Friday at the straight time rate. The starting time of work will be arranged to fit such conditions of work. Such shifts shall consist of eight (8) hours of work for eight (8) hours of pay or ten (10) hours of work for ten (10) hour of pay on a four-ten shift.

h. When an employee is called out to work without at least eight (8) hours off since his/her previous shift, all such call out time shall be paid at the applicable overtime rate until he/she shall have eight (8) hours off.

i. Holiday Week: In the event that a holiday is celebrated during the week (Monday through Friday), the remaining four days of the week may be worked as a four-ten shift at the straight time rate on a voluntary basis with three (3) days' notice to the Union.



15



15.2    Work performed on Saturday shall be paid for at the rate of time and one-half for the first eight (8) hours and at the rate of double time thereafter.  Work performed on Sunday or holidays shall be paid for at the rate of double time.

15.3    The following shall be recognized as legal holidays:  New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, Friday after Thanksgiving, Saturday after Thanksgiving, Christmas Eve and Christmas Day.  If a holiday falls on Sunday, the following Monday shall be considered as a holiday. Overtime rate of double time shall apply to the above holidays, except no work at all shall be performed on Labor Day. Martin Luther King Day will be recognized as a day of observance and any employee can take the day off without recrimination provided the employee gives the Job Superintendent 48 hours notice s/he will be observing the holiday.

15.4    Two shift operations shall consist of five (5) or more consecutive days. The day shift shall work eight (8) hours for eight (8) hours pay.  The swing shift shall receive eight (8) hours pay for eight (8) hours worked.  The graveyard shift shall receive eight (8) hours pay for seven and one-half (7-1/2) hours worked.  On a multiple shift operation the Friday graveyard shift ending on Saturday morning will be considered Friday work.  The Saturday graveyard shift ending Sunday morning will be considered Saturday work.  The Sunday graveyard shift ending on Monday morning will be considered Sunday work.

15.5    Three Shift Operation

First Shift - The regular hours of work on the first shift of three shift operations shall be eight (8) hours of continuous employment, except for lunch period at mid-shift, between the hours of 4:00 a.m. and 6:00 p.m.

Second Shift - The second shift shall be seven and one-half (7-½) hours of continuous employment except for lunch period at mid shift, and shall be paid for at eight (8) hours at the straight time hourly rate.

Third Shift - The third shift shall consist of seven (7) consecutive hours of employment, except for lunch period at mid shift, and shall be paid for at eight (8) hours at the straight time hourly wage rate.

15.6    Where a single shift starts at a premium rate and carries over to a lesser rate, the starting rate continues, unless there is a full eight (8) hour break between shifts.

15.7    Personal hand tools furnished by the Taper shall consist of broad knives 1", 2", 4", 6", 10", 12", hand mixer, mud pan, scrub brush, pole sander, snips, 2 buckets, utility knife, file, Phillips screw driver, tape reel, hammer, hand sander and whites, (please see attached list).  The Employer shall furnish all tools with movable parts, all power tools and stilts.  The Employer will keep all stilts in good working conditions and will pay for all the repairs.





16

On jobs where four (4) or more employees are working the contractor agrees to provide secure storage for the employees tools. If the employer fails to provide secure storage for the employees the employer shall be liable for the employees required personal hand tools.

The use of stilts should not be a requirement of employment.  If stilts are used, they will not exceed 36" in height or be used in unsafe working conditions.

15.8    Any new materials or equipment coming into the trade and, after proper analysis considered injurious to the health, shall not be used.

15.9    Employees are not required to report to the job or shop more than 30 minutes before working time.

15.10   No employees shall resort to any extreme measure to rush one another and thereby do injury to the trade.

15.11   It shall be understood that the preparation of materials and equipment, or the cleaning up and removal of same, is to be performed by employees or Employers, within working hours.  All spray texture employees shall have sufficient cleanup time. Employees shall be allowed five (5) minutes before lunch and at the end of a shift for personal cleanup.

15.12   Employees who report at the time they are instructed by the Employer or his agent, and who are not put to work, shall be paid two (2) hours pay and shall remain at the job-site for the two (2) hours if required by the Employer, except where employees are not put to work because of inclement weather or other conditions beyond the Employer's control.  All employees when ordered to work must be guaranteed a minimum of two (2) hours pay which will be compensated at the appropriate rate, including overtime if applicable. If the Union dispatches a worker to the Employer and the worker turns out not to be legally employable or fails an appropriately administered pre-employment drug test due to drug use, the two (2) hours show up pay shall not be applicable and the worker shall receive no other compensation for the drug testing time.

15.13   It shall not be condition of employment, but the employee shall be permitted, at their discretion, to haul in his or her vehicle at no additional expense to the employer: Hand tools (excluding Ames taping tools or the equivalent thereof), Cord, Drill Motor, Stilts, Material.

## ARTICLE 16
## TRAVEL PAY & SUBSISTENCE

16.1    Zone Pay Differential: The parties recognize that it is sometimes inconvenient to get to the job location because of varying distances.  It is agreed and understood that while traveling to and from work, the employees are not within the course and scope of their employment and the relationships of Employer-employee do not commence until the hourly wage commences.





General Travel Conditions: When the only access roads to a job require employees to travel into a higher travel zone and back to the zone in which the job is located, then the employees shall be paid the zone pay differential provided for the higher zone.

Toll and Ferry Fares: All necessary ferry or other forms of water transportation are to be reimbursed by the Employer in the following instances and manner:

Employees will be reimbursed at the passenger's fare or passenger's carfare when substantiated by receipts.

When employees elect to live at or near the project and forego daily ferry travel, it is recognized that they are entitled to the prerogative of visiting their homes for the weekend, and in that event, ferry charges shall be paid for such weekend travel as substantiated by receipts.

When circumstances make it necessary that a toll bridge be utilized, the employees will be reimbursed accordingly.

Board and Lodging: When the Employer provides camp or board and lodging, the basic wage scale will be observed and the rate for camp and board and lodging will not exceed $3.00 per day to be paid by the employee. Any costs over $3.00 per day will be absorbed by the Employer. The applicable travel shall apply on the first and last day of employment, with the exception that should the employee quit of his/her own volition prior to five (5) days employment, travel expenses shall be allowed for the first day only. Jobs in remote areas where camp or board and lodging is not provided and housing is inadequate or cost for housing is prohibitive, the Employer will make every effort to arrange for housing at reasonable rates for the employees.

Remote Projects:   On dam, hydro-electric, building projects and other remote engineering projects such as airports, refineries and radar or radio installations, but not limited thereto, where the Employer provides camp or board and lodging, required travel time will be paid for the initial trip to the job and return. Payment of travel time on the return trip will be paid to all employees, including discharges and layoff; the only exception that shall apply will be as to those employees that remain on the job less than thirty (30) calendar days who voluntarily quit.

16.2   Zone Pay: Zone pay differential shall be paid on jobs located outside of the free zone computed from the city center of the following listed cities:

| Aberdeen | Bremerton | Mount Vernon | Renton |
|---|---|---|---|
| Anacortes | Centralia | Olympia | Seattle |
| Auburn | Everett | Port Angeles | Shelton |
| Bellingham | Hoquiam | Port Townsend | Tacoma |

Zone A:    0 – 25 mile radius miles - free
Zone B:    Over 25 radius miles - $3.00 per hour

In the event the employee lives closer to the job site than the closest Zone city center, the employee's home shall be used as the starting point for the purpose of travel pay.





16.3 <u>Parking Fee</u>: If an employee is required to park his vehicle at a parking lot, and is subsequently the same day required to remove his vehicle and park in another parking lot due to direction given by his Employer, the employee shall be entitled to reimbursement for said second parking upon presentation of signed parking lot ticket to Employer.

16.4 On job sites that mandate remote parking requiring shuttle transportation, the practice shall be that Employees travel one way on the Employers time and the other way on their own time. It is understood that the Employer may designate.

### ARTICLE 17
### OUT OF AREA WORK

17.1 The employer, when engaged in work outside the geographical jurisdiction of IUPAT District Council 5 may employ 50% of the workers needed for such work from his home area. When workers are unavailable from the area where the work is to man the other 50% of the crew, any other may be employed as needed to meet project requirements.

17.2 In the event that an Employer takes any employee outside of the general area covered by this Agreement, such employee shall receive the higher of the rates of pay or better working conditions as specified in this Agreement, or in the prevailing Agreements in the area where they are working and in all events the Employer shall continue to pay the hourly contributions for all Trusts as specified in this Agreement on such employees.

17.3 The Employer party hereto shall, when engaged in work outside the geographical jurisdiction of this Agreement, comply with all of the lawful clauses of the collective bargaining Agreement in effect in said other geographical jurisdiction and executed by the Employers of the industry and the Local Unions in that jurisdiction including, but not limited to, the provisions of the wages, hours, working conditions and all fringe benefits therein, provided there shall be no dual fringes.

17.4 Labor and Management agree to cooperate to work together to negotiate with the responsible parties in the rest of the State a statewide Drywall Agreement. In the event a statewide Drywall Agreement is negotiated, it is mutually agreed that it shall not be substandard or inferior in any way to the Western Washington Area Agreement for the Drywall Industry.

### ARTICLE 18
### OVERTIME PERMIT

18.1 Employers who are working outside their usual local areas within Western Washington must report their jobs to the Local Union in the area of work or to the District Council. Overtime jobs on, Sundays and holidays regardless of the area will likewise be reported.





18.2 If the Employer fails to strictly comply with the requirements of this Article, the District Council and/or Local Union will send a warning letter with a copy to the NWCCA, that on any future violation, the Employer shall be required to pay one hour at the basic rate for each hour worked to the Apprenticeship Fund in the area of the violation.

## ARTICLE 19
## WAGES & CLASSIFICATION

19.1 All wages, travel and subsistence pay shall be due and payable by negotiable check payable on demand at par or by lawful currency in an envelope. In either case, it shall include a receipt (check-stub) showing the employee's and Employer's names, rate of pay, dates and hours work both regular and overtime, travel and subsistence pay and all deductions made and amount due. No more than three (3) days pay shall be held back. The said payments shall conform to all provisions pertaining to the payment of employees as required in this Agreement and Federal and State Laws. Violation of this clause shall be deemed sufficient reason for removal of employees by a Local Union and/or District Council Representative, and said removed employees shall be paid waiting time as per Section 6 of this Article.

19.2 In the case of an out-of-town Contractor, a reasonable time or arrangement must be allowed to secure the employee's pay, but in such cases the waiting period shall not start until the beginning of the 2nd shift, in which the discharge or layoff occurred except Saturday, Sunday and holidays. Employees must report to the Local Union no later than 12:00 noon the following day after such wages are due and payable. Established payday shall be recorded with the Union by all signatory members to the Agreement. Requests for additional time, or variations to this Section, must be filed with the Local Union or District Council prior to any change in the regular pay period.

19.3 Employees feeling they have a grievance pertaining to any compensation for wages, travel time or board and room shall file such claim with their Employers as soon as possible. To be valid a grievance must be filed within 10 working days of the occurrence or knowledge but in no event later than 45 working days from the actual event. Working days are Monday through Friday not counting any listed holidays.

19.4 a. It is agreed by the Union that the wages and conditions described in this Agreement are the minimum wages and conditions for dispatching of employees and no employee shall be permitted to work for any Employer signatory to this Agreement for wages or under conditions below the minimum described herein.

b. If the Union enters into an Agreement applicable to work covered by this Contract which contains lesser wages or fringe benefits than provided herein, the Employer parties to this Contract shall be permitted to pay such lesser wages or benefits; provided, however, that this paragraph shall not be applicable to single job Agreements which the Union enters into for the purpose of permitting an Employer party to this Contract to compete against a nonunion Contractor or to a targeted Market Recovery Job Site.





19.5    Workers shall be paid in full once each week (on the same day), but in no event shall more than five days after the regular pay period (Saturday and Sunday excluded) wages be withheld. If the regular payday falls on a holiday, the workers shall be paid on the last regular workday preceding the holiday. Payment, if so desired, may be made by regular mail (with postmark cancellation date accepted as proof of payment date) or, by mutual consent of employee and employer, direct bank deposit.

19.6    Employees laid-off for lack of work or who quit must be paid in full by the next regular pay period. The employee may receive his pay in person at the Employer's place of business or by mail. Employees discharged must be paid in full by the next regular pay period. Failure to do so, or failure to pay and employee on the regular payday, or payment of an employee by N.S.F. or otherwise non- negotiable check shall constitute a separate and willful violation of this Agreement. If an employee incurs N.S.F. charges because of having received an N.S.F. check from the Employer, the Employer will be liable for all N.S.F. charges from the employees' bank. In such instances, the Union may, at its' discretion, assess damages against such Employer to the extent of time and one-half of the employees' regular rate of pay for all "waiting time" including Saturdays, Sundays or holidays, or take any other remedial steps as outlined in the Agreement. "Waiting time" shall be construed, for the purpose of this Section, as not more than eight (8) hours in any 24-hour period during which an employee has not received pay.

19.7    The Employer may, at their discretion, have one ten (10) day grace period from the date of the original check in which to provide a replacement.

19.8    The Employer may request the Employee to sign an affidavit, or other instrument, with a statement that Employee will not, if the check is found or returned to the Employee, cash the first check.

19.9    In the event a replacement check is cashed, in addition to a lost, stolen or damaged check, the Employer may charge interest, penalties and administrative fees to the Employee.

19.10   Should any employee cash, deposit or otherwise accept funds from the transfer of an original check and also from a replacement check, issued in addition to the original the employer may pursue from the employee, by all legal methods, the repayment of the original check amount in full.

19.11   The refunding of wages (commonly referred to as kickbacks) to Employers or acceptance of said refund (or kickback) by an Employer shall constitute a distinct and separate violation of this Agreement. This Section shall be in addition to any right accruing in Sections 221 and 225 of the Federal Labor Code that makes "kickbacks" punishable by fine and imprisonment.

19.12   In the event a Public Works Project (Prevailing Wage Job) is determined by either a Federal, State or other Public Agency to contain a different wage rate than the negotiated Union wage rate in this Agreement, the Employer shall be allowed to use the prevailing wage rate in their bidding process, and in payment of the prevailing



21



wage rate to employees covered by the Agreement. Fringe benefit rates, the work day, the workweek and overtime rates shall be those as provided for elsewhere in this Agreement. The Employer agrees to cooperate with the appropriate public agency and the Union in filling out wage survey information as requested by the appropriate public agency or the Union. The Union agrees to dispatch employees at the prevailing wage rate to Employers who are in compliance with all other provisions of this Agreement.

19.13 On or before June 17th the Union must notify the Employer, via registered mail, of how the wages for the July 1st revised wage scale will be divided between wages and fringe benefits. At the Employers option, if notification is not received before June 17th, the Employer will not be responsible to pay per the revised breakdown for a period of ten (10) days. Contract anniversary years shall be exempt from this article.

19.14 Wages & Benefits

Journeyman Drywall Finisher (Taper)

|  | July 1, 2016 | July 1, 2017 | July 1, 2018 |
|---|---|---|---|
| Hourly Wage | $38.65 |  |  |
| Health & Welfare | $ 7.14 |  |  |
| IUPAT Pension | $ 4.87 | +$1.67/hr | +$1.84/hr |
| WW Pension | $ 4.10 | on | on |
| Industry Fund | $ 0.35 | 7/1/2017 | 7/1/2018 |
| Apprenticeship | $ 0.50 |  |  |
| LMCF | $ 0.05 |  |  |
| Total Package | $ 55.66 | $ 57.33 | $ 59.17 |

Employee Deductions:

| Dues Check-off | - | 3.3% of gross wages |  |
|---|---|---|---|
| Market Recovery Program | - | $0.60 per hour | (Journey Level Only) |
| Journey Training Fund | - | $0.35 per hour | (Journey Level Only) |

Foreman Pay: Any Drywall Finisher (Taper) designated as Foreman shall be paid, as a minimum, an additional nine percent (9%) over the Journey Level rate. When there are four (4) or more Drywall Finishers on the job at least one (1) will be a Foreman.

General Foreman Pay: Any Drywall Finisher (Taper) designated as General Foreman shall be paid, at the minimum, an additional nine percent (9%) per hour over the Journey Level rate.





Apprentice Wage Scale:

| | | | |
|---|---|---|---|
| 1st  Bracket | - | 50% of Drywall Finishers scale | $  19.33 |
| 2nd  Bracket | - | 55% of Drywall Finishers scale | $  21.26 |
| 3rd  Bracket | - | 65% of Drywall Finishers scale | $  25.12 |
| 4th  Bracket | - | 75% of Drywall Finishers scale | $  28.99 |
| 5th  Bracket | - | 85% of Drywall Finishers scale | $  32.85 |
| 6th  Bracket | - | 90% of Drywall Finishers scale | $  34.79 |

Thereafter, 100% of Drywall Finishers scale.

Full fringes are to be paid on all Apprentices.

19.15   Painters:  Painters will have parity to wages and benefits as in the current Western Washington Area Agreement for the Professional Painting Industry.

## ARTICLE 20
## JOURNEY LEVEL EDUCATIONAL OPPORTUNITIES

20.1   Labor and management are committed to continuing Journey worker training and the lifelong learning process.  A Labor-Management Committee consisting of no more than three (3) from each party shall meet on a quarterly basis to develop, monitor, and enhance a program to facilitate this common desire.  A few examples of the topics that could be included in this program are, but not limited to:  Safety, new material and techniques for installation, production techniques, ESL and ergonomics.  This committee will work in conjunction with the JATC in development, monitoring and enhancement of the program.

20.2   In the event a Journey level worker should not be working at that level and educational opportunities be needed using the same standards as the Union and Employer have used in Article 12.1(c) then, Article 12.1(c) shall apply to such worker. The Union may grieve the determination of the Employer to invoke this provision with respect to any employee it believes is being unjustly affected.

20.3   Commencing on July 1, 2016, Labor agrees to divert thirty-five ($0.35) per compensable hour to establish a continuing education fund to provide for stipends to Journey workers to attend classes and obtain the certifications required under Article 12.1(d).  The fund will be administered by the IUPAT Local 364.

## ARTICLE 21
## TRUSTS

21.1   Each Employer signatory to this Agreement is required to make reports to the Trusts (see Article 22) and remit with contributions, if any due to Western Washington Painters Pension Trust, Zenith American Solutions, Inc., 201 Queen Anne Avenue North, #100, Seattle, Washington 98109-4896 (hereafter called the central distribution point) or such other place as may be designated.  The report and payment





must be postmarked by the Post Office no later than the 15th day of the month following the month in which the hours were worked. If, in the opinion of a CPA, as provided for in Section 4 and 5 of this Article, employed by the Union of any of the Trust Funds, the Employer has failed to maintain accurate time records, it shall be conclusively presumed that each employee who performed any services in a given week worked 40 hours in that week.

21.2    In the event an Employer fails to make any of the contributions or remittances as required by this Contract, such Employer shall be required to pay in addition to the principal sum due, liquidated damages in the amount of $12.50 for each month's delinquency (divided as follows: $5.00 to Health and Welfare; $5.00 to Pension; and $2.50 to Apprenticeship) or 10% of the amount due, whichever is greater, and shall also be liable for reasonable attorney's fees and the costs of collection. In the event suit is initiated it is agreed that such suit shall be filed in a court of competent jurisdiction (either State or Federal) located in King County, Washington.

21.3    By entering into this Agreement, the Employer adopts and agrees to be bound by the terms of the Trust Agreements establishing the Funds referred to in this Article and agrees to be bound by all past and future lawful acts of the Trustees of each such Fund. The Employer shall not be bound by the terms of any Trust Agreement or the actions of the Trustees of any Trust Fund unless the Employer is obligated to make contributions to such Fund pursuant to this Contract.

21.4    The Grievance Committee, Trusts, or Union shall have the authority to appoint a C.P.A. who shall have the right to enter upon the Employer's premises at reasonable times, during normal business hours, and inspect and copy business records and conduct other relevant duties to function as ordered by the Grievance Committee, Trusts or Union. Such records as required by said agent to perform his duties will be provided by the Employer.

21.5    It shall be the duty and right of the Trustees of the Trusts to audit each Employer party to this Agreement once each three (3) years. The net cost of any such audit shall be borne pro-rata by the Trusts and the Union.

21.6    If an Employer audit conducted under the authority granted by this Agreement reveals an under payment of either wages or fringe benefits (Health and Welfare, Pension, Apprenticeship, etc.) the Employer shall be required to pay the entire costs of the audit and liquidated damages due; unless, the under payment of fringes as revealed by an audit is less than 2% for the period under audit.

21.7    The Trustees of each of the Trusts shall be obligated to accept contributions from any Employer who is party to an Agreement with the Union. The term Employer as used in this Section includes governmental and quasi-governmental entities.

21.8    Employers having working Agreements with Unions affiliated with the Union of Painters and Allied Trades may participate in the Trusts by adopting the Agreement and Declaration of Trusts and conforming to regulations as determined by the Trustees of such Trust.



24



21.9    Election and terms of Trustees shall be in accordance with the Agreement and Declaration of the Trusts, and amendments to the Trusts will be acted upon by the Industry Board in lieu of the Western Area Council.

21.10   No Industry Funds shall be expended by the NWCCA for any of the following purposes:

      a.  Lobbying in support of anti-labor legislation.

      b.  The subsidizing of the NWCCA or Contractors during a period of authorized strike or lockout.

      c.  Payments directly or indirectly to any Union, representative of any Union, or representative of any employees employed by any person required to make contributions to the benefit of any individual Employer, or to the operation and maintenance of the NWCCA, provided, however, that any representative of the NWCCA and the NWCCA itself may be paid such sums as are reasonable and equitable for actual services rendered in connection with any authorized purpose.

      d.  Any purpose which is contrary to existing law.

21.11   Accounting of expenditures of Industry and Specifications Funds shall be available to the NWCCA, IUPAT District Council 5 and/or Unions upon request.

## ARTICLE 22
## TRUST FUNDS BENEFIT LEVELS

22.1    Trust Funds heretofore established for the benefit of the employee shall continue in full force and effect provided, however, that the Union shall have the option to apply a portion of any wage increase to maintain or increase the level of benefits under any of the Trust Funds and provided further the Union shall have complete discretion with respect to the allocation of any increase or increases which shall accrue during the term of this Agreement.

22.2    TRUST FUND PAYMENTS - All fund payments are in addition to wages and other benefits provided for in this Agreement.  Each Employer agrees to pay, on behalf of each employee (both Union and non-Union) the following fringe benefits for each compensable hour received by such employee:

      a.  Effective upon ratification, each Employer shall pay into the Painters Trust Health and Welfare, Dental and Vision Plans seven dollars and fourteen cents ($7.14) per compensable hour.

      b.  Effective upon ratification, each Employer shall pay into the Western Washington Apprenticeship and Training Trust for the Painting and Drywall Industry fifty cents ($0.50), with five cents ($0.05) per hour being forwarded to the International Joint Apprenticeship and Training Fund.





     c. Effective upon ratification, each Employer shall pay four dollars and ten cents ($4.10) per compensable hour for each employee to the Western Washington Painters Defined Contribution Pension Trust. The Trustees and the Trustors of the Western Washington Pension Plan are permitted to amend the Plan to an individual contribution such as a 401(a) type plan or to authorize a replacement plan.

     d. Effective upon ratification, each Employer shall pay four dollars and eighty-seven cents ($4.87) per compensable hour for each employee to the International Union of Painters and Allied Trades (IUPAT) Union and Industry Pension Fund.

     e. Effective upon ratification, each Employer shall pay five cents ($0.05) per compensable hour for each employee to the IUPAT Labor Management Cooperation Fund.

22.3    Payments to all Trusts including Pension on behalf of all Apprentices shall commence with the first hour of employment.

22.4    Effective upon ratification, each Employer agrees to pay on or before the fifteenth (15th) of each month thirty-five cents ($0.35) per compensable hour on all employees to the Northwest Wall & Ceiling Industry Trust Fund.

22.5    Effective upon ratification, all Employers signatory to the Western Washington Area Agreement for the Drywall Industry dated July 1, 2016, agree to administrative dues, commonly known as dues check-off adopted by the Western Washington Area Local Unions (plus any and all dues, withholdings or assessments approved by the Unions as a wage deduction). The Employers also agree to deduct sixty cents ($0.60) per compensable hour from Journey level employees (on all non federal Davis Bacon work) for the Union Market Recovery Program.

The Employers further agree that on or before the 15th of each month, on uniform reporting forms furnished by the distribution agency, to remit deductions of 3.3% of gross wages on all employees to the central distribution point (plus any and all dues, withholdings or assessments approved by the Union as a wage deduction), the Western Washington Painters Pension Trust, 201 Queen Anne Avenue North, #100, Seattle, Washington 98109-4896.

The obligation to the Employers shall apply only as to employees who have voluntarily signed a valid dues deduction authorization card to be furnished by IUPAT District Council 5.

On or before the 15th of each month, the Employers will submit a list of all employees covered by the Agreement who have not signed a dues deduction authorization card, together with the number of hours worked by each such employee during the month previous.





## SAMPLE AUTHORIZATION CARD

I hereby authorize and direct my present Employer and any other Employer by whom I may be employed, (if such Employer has a Labor Agreement with IUPAT District Council 5) to deduct 3.3% of gross wages (plus any and all dues, withholdings or assessments approved by the Union as a wage deduction) from my wages and promptly transmit such moneys to IUPAT District Council 5. This authorization shall be in effect for the term of the current Labor Agreement or for one year, whichever is the earlier, and shall automatically renew itself for successive one year periods, unless rescinded by written notice given to IUPAT District Council 5within the 60 day period preceding the automatic renewal of the authorization.

In case more authorization cards are needed call (206) 441-5554

_____              _____
DATE                                     SIGNATURE

## ARTICLE 23
## IUPAT PENSION

23.1    Commencing with July 1, 2016, the Employer agrees to make payments to the IUPAT Union and Industry Pension Fund for each employee covered by this Agreement, as follows:

      a.   For each hour or portion thereof for which an employee receives pay, the Employer shall make a contribution of four dollars and eighty-seven cents ($4.87) to be allocated to the IUPAT Union and Industry Pension Plan.

      b.   For the purpose of this Article, each hour paid for, including hours attributable to show up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

      c.   Contributions shall be paid on behalf of any employee starting with the employees' first day of employment in a job classification covered by this Agreement.

      d.   The payments to the Pension Fund required above shall be made to the IUPAT Union and Industry Pension Fund, which was established under an Agreement and Declaration of Trust, dated April 1, 1967. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as amended from time to time, as though he had actually signed the same.

23.2    The Employer hereby irrevocably designates as its' representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors. The Employer further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust, as amended from time to time.





23.3    All contributions shall be made at such time and in such manner as the Trustees require: and the Trustees may at any time conduct an audit in accordance with Article V, Section 6 of said Agreement and Declaration of Trust.

23.4    If an Employer fails to make contributions to the Pension Fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due together with attorney fees and such penalties as may be assessed by the Trustees.  The Employers' liability for payment under this Article shall not be subject to, or covered by, any grievance or arbitration procedures or any "no-strike" clause that may be provided or set forth elsewhere in this Agreement.

23.5    The Pension Plan adopted by the Trustees shall at all times conform with the requirements of the Internal Revenue Codes so as to enable the Employer at all times to treat contributions to the IUPAT Union and Industry Pension Fund as a deduction for income tax purposes.

## ARTICLE 24
## SEPARABILITY

24.1    Should any part of, or any provision herein contained be rendered or declared invalid by reason of any existing or subsequently enacted legislation, or by any decision of any agency or a court of competent jurisdiction, such invalidation shall not invalidate the remaining portions thereof; provided however, upon such invalidation the parties signatory hereto agree to immediately meet to renegotiate such parts of provisions affected.  If agreement is not reached within sixty (60) days after negotiations are requested, the Employer or the Union shall have the right to take economic action. The remaining parts or provisions shall remain in full force and effect.

24.2    This Agreement is not intended to and shall not be construed to permit acts that violate any valid Federal or State law.  This Agreement is not intended to nor shall it be construed as creating, recognizing or imposing, on the Union or Employer any common law duties.

24.3    Any changes in this Agreement, or amendments before its' date of expiration, must be approved by a majority respectively of the Unions, and Chapters before becoming operative, and if so approved, shall be observed by and shall be binding to all parties signatory to this Agreement.

24.4    This Agreement (including Addenda) may be executed in multiple counterparts, all such counterparts shall constitute, when taken together, one and the same instrument as if all such signatories were contained in the original.

24.5    Job Notice:  The Employer will notify the IUPAT District Council 5 office of every job that the Employer has undertaken or been contracted to perform.



## ARTICLE 25
## SICK LEAVE WAIVERS

25.1   The parties to the Western Washington Area Agreement for the Drywall Industry hereby expressly waive the provisions of the City of Seattle Ordinance 123698 and City of Tacoma Ordinance 28275, requiring paid sick leave and any other similar ordinances adopted by a jurisdiction.

## ARTICLE 26
## DURATION OF AGREEMENT

26.1   This Agreement shall remain in full force and effect from July 1, 2016 until June 30, 2019, and shall automatically renew itself from year to year thereafter unless the Employers or the Union give written notice of intention to modify the terms of this Agreement or to terminate this Agreement at least sixty (60) days, but not more than ninety (90) days prior to June 30, 2019, or as the case may be, of a subsequent anniversary date.  Either the Union or the Employers, if such party has given notice of intent to modify this Agreement, may terminate this Agreement by written notice any time after June 30, 2019.

IN WITNESS WHEREOF this Agreement has been executed by the parties hereto and ratified and accepted as indicated by their signatures below:

DATED AND SIGNED THIS ___1___ day of _August_____, 20 _16_.

**NORTHWEST WALL AND CEILING**
**CONTRACTORS ASSOCIATION, INC.:**

Dick Mettler
Executive Director

**IUPAT DISTRICT COUNCIL 5:**

Denis Sullivan
Business Manager

John Boufford
Business Representative / Union Negotiator

*opeiu#8/afl-cio*



## ADDENDUM "A"
## RESIDENTIAL

It is agreed by the parties signatory hereto that this Memorandum of Understanding is an Addendum to the Western Washington Area Agreement for the Drywall Industry.

The purpose is to reclaim work done in the housing industry.

Definition of housing industry:

Any residential project, single or multi-family, which is constructed of wood frame.

**Wage rate:**

07/01/2016 -    $27.26 per hour, or incentive pay, whichever is greater.

07/01/2017 -    $27.26 per hour or incentive pay, whichever is greater.

07/01/2018 -    $27.26 per hour or incentive pay, whichever is greater.

**Incentive pay:**

07/01/2016 -    $0.22 minimum per square foot of GWB taped and finished, ready for texture.

07/01/2017 -    $0.22 minimum per square foot of GWB taped and finished, ready for texture.

07/01/2018 -    $0.22 minimum per square foot of GWB taped and finished, ready for texture.

It is understood that the minimum rate is for a simple construction with 8' high ceilings.  Rate for other conditions can be negotiated with the workman.

NORTHWEST WALL AND CEILING                    IUPAT DISTRICT COUNCIL 5:
CONTRACTORS ASSOCIATION, INC.:

Dick Mettler                                                  John Bouford
Executive Director                                        Business Representative / Union Negotiator

*opeiu#8/afl-cio*



## ADDENDUM "B"
## PRE-APPRENTICES

It is agreed by the parties signatory hereto that this Memorandum of Understanding is an Addendum to the Western Washington Area Agreement for the Drywall Industry.

**SECTION 1:**   To assist in the recruiting and upgrading of the quality of workers entering the Apprenticeship program as outlined above, the Pre-apprenticeship Program shall be established as part of this Agreement.  When so established, it shall operate under the following rules:

**SECTION 2:**   Pre-apprentices shall be registered with the District Council 5 Joint Apprenticeship and Training Committee.

**SECTION 3:**   No Employer may employ workers in this classification unless he shall, at all times, have Apprentices and Journey workers employed in a one (1) Apprentice to five (5) Journey workers ratio (i.e. - no Apprentice, no Pre-apprentice; less than five (5) Journey workers, no Pre-apprentice.)  In order to hire more than one (1) Pre-apprentice, the 1 – 5 ratio must repeat itself.

**SECTION 4:**   An Affirmative Action Program to encourage the recruiting, training and employment of minorities and women shall be established. Administration will be done by the Joint Apprenticeship and Training Committees.

**SECTION 5:**   Failure by the Employer to observe these rules shall be cause for the Union and the Joint Apprenticeship and Training Committee to deny the right of such Employer to hire Pre-apprentices. In the event the Employer has violated the foregoing rules, he shall also be required to pay Journey level wages and fringes on all hours worked by such employee.

**SECTION 6:**   Pre-apprentices will start the first bracket at 50% of the Journey level wage with health and welfare only paid.

**SECTION 7:**   There will be no Student Permits.

**SECTION 8:**   No Pre-apprentice may be employed for more than 90 calendar days before becoming indentured as a First Bracket Taper Apprentice.


NORTHWEST WALL AND CEILING
CONTRACTORS ASSOCIATION, INC.:

IUPAT DISTRICT COUNCIL 5:

Dick Mettler
Executive Director

John Boufford
Business Representative / Union Negotiator

*opeiu#8/afl-cio*





## Drywall Finisher Required Tool List

Per the contract, the following items are required prior to starting work:

| | |
|---|---|
| 1" knife | |
| 2" knife | |
| 4" knife | |
| 6" knife | |
| 10" knife * | |
| 12" knife * | |
| Stomper | |
| Pan | |
| Bucket Brush | |
| Pole Sander | |
| Snips | |
| 2 Buckets | |
| Utility Knife | |
| File | |
| Hand Sander | |
| Tape Reel | |
| Hammer | |
| Screwdriver | |
| White pants or white coveralls | |
| The CPR First Aid Card | |

\* It can be substituted with the Hawk and Trowel

Please read the Collective Bargaining Agreement and other associated literature prior to starting work.

Employees are not required to provide power or automatic tools.



Due to the federal regulations your employer will require two forms of Identification such as, but not exclusive to, a drivers license and a social security card. For a complete list of options please inquire at your Local.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*opeiu#8/afl-cio*



# SIGNATURE PAGE

## 2016 – 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

**EMPLOYER:**

Name of Company: _____

By: _____        _____
           (Signature)                                                        (Print Name)

Title: _____        Date: _____.

Address: _____
                                               City         State     Zip Code

Phone: _____        Fax: _____

E-mail: _____

WA State Contractor's Registration #: _____

Federal Tax ID #: _____

**UNION:**
**IUPAT DISTRICT COUNCIL 5**

By: _____        _____
           (Signature)                                                        (Print Name)

Title: _____        Date: _____

*opeiu#8/afl-cio*

# <u>SIGNATURE PAGE</u>

### 2016 – 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

**EMPLOYER:**

Name of Company: _____

By: _____     _____
              (Signature)                                    (Print Name)

Title: _____     Date: _____

Address: _____
                                                  City          State          Zip Code

Phone: _____     Fax: _____

E-mail: _____

WA State Contractor's Registration #: _____

Federal Tax ID #: _____

**UNION:**
**IUPAT DISTRICT COUNCIL 5**

By: _____     _____
              (Signature)                                    (Print Name)

Title: _____     Date: _____

*opeiu#8/afl-cio*

# SIGNATURE PAGE

## 2016 – 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

EMPLOYER:

Name of Company: _Alliance Partition Systems_

By: _[Signature]_  _Mike Powers_
(Signature)  (Print Name)

Title: _President_  Date: _8/5/16_

Address: _18824 Smokey Point Blvd Sh 101, Arlington, WA 98223_
City  State  Zip Code

Phone: _360 659-0400_  Fax: _360 659-0449_

E-mail: _Mike@alliancepartitions.com_

WA State Contractor's Registration #: _ALLEAPS876P4_

Federal Tax ID # _80-0516178_


UNION:
IUPAT DISTRICT COUNCIL 5

By: _[Signature]_  _John Bufford_
(Signature)  (Print Name)

Title: _Business Representative_  Date: _8/5/16_

opeiu#8/afl-cio

# SIGNATURE PAGE

## 2016 – 2019

## Western Washington Area Agreement

## for the Drywall Industry

## between

## the International Union of Painters and Allied Trades District Council 5

## and

## the Signatory Employer

**EMPLOYER:**

Name of
Company: Anning Johnson Company

By: _____  Luke Prigg _____
        (Signature)                                    (Print Name)

Title: Vice President                                    Date: August 23, 2016

Address: 14700 NE 95th St, Ste. 201    Redmond     WA       98052
                                                             City           State        Zip Code

Phone: 425-885-1990                          Fax: 425-883-2317

E-mail: lprigg@anningjohnson.com

WA State Contractor's Registration #: ANNINC*984KB

Federal Tax ID #: 36-2936794


**UNION:**
IUPAT DISTRICT COUNCIL 5

By: _____  John Burford _____
        (Signature)                                    (Print Name)

Title: Business Representative          Date: 8/8/16

IUPAT DC 5 Western Washington Area Agreement for the Drywall Industry   Signature Page
July 1, 2016 – June 30, 2019

# SIGNATURE PAGE

### 2016 – 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

**EMPLOYER:**

Name of Company: _D. L. Henrichsen Co Inc_

By: _____ (Signature) _Don Henrichsen_ (Print Name)

Title: _Secretar Treasurer_     Date: _7/8/16_

Address: _600 S 20ᵗ St_     _East_ City _Tacoma_ State _WA_ Zip Code _98424_

Phone: _253 - 922 - 5566_     Fax: _253 - 922 - 2178_

E-mail: _Don d@ Dlhenrichsen.com_

WA State Contractor's Registration #: _DLHENC19166_

Federal Tax ID #: _91 1123785_

**UNION:**
IUPAT DISTRICT COUNCIL 5

By: _____ (Signature)     _The Buffod_ (Print Name)

Title: _Business Representative_     Date: _8/8/16_

*opeiu#8/afl-cio*

# SIGNATURE PAGE

## 2016 – 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

**EMPLOYER:**

Name of Company:  **Enderis Company, Inc.**

By: _____
(Signature)

**James Baer**
(Print Name)

Title:  **President**

Date:  **08/23/16**

Address:  **253 S Holden St.**

**Seattle**
City

**WA**
State

**98019**
Zip Code

Phone:  **206-762-2447**

Fax:  **206-762-2367**

E-mail:  **enderis@enderisgwb.com**

WA State Contractor's Registration #:  **ENDERCI110PA**

Federal Tax ID #:  **91-1428480**


**UNION:**
IUPAT DISTRICT COUNCIL 5

By: _____
(Signature)

_John Boufford_
(Print Name)

Title: _Business Representative_

Date: _8/8/16_

opeiu#8/afl-cio

# SIGNATURE PAGE

## 2016 – 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

**EMPLOYER:**

Name of Company: _EXPERT DRYWALL, INC._

By: _(Signature)_                    _MARTIN HOLBERG_
                                      (Print Name)

Title: _PRESIDENT_                    Date: _____

Address: _15140 - NE 92ª_    _REDMOND_    _WA_    _98052_
                              City        State    Zip Code

Phone: _425-284-1890_              Fax: _425-284-1899_

E-mail: _martyh@expertdrywall.com_

WA State Contractor's Registration #: _EXPERD * 34901_

Federal Tax ID #: _91-0774308_


**UNION:**
IUPAT DISTRICT COUNCIL 5

By: _(Signature)_                    _John Bufford_
                                      (Print Name)

Title: _Business Representative_      Date: _8/8/16_

*opeiu#8/afl-cio*

# SIGNATURE PAGE

## 2016 – 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

**EMPLOYER:**

Name of Company:   **Firstline Systems Inc**

By: _(Signature)_   **Michael Newman** (Print Name)

Title:   **President**      Date:   **8/5/2016**

Address:   **13621 NE 126th Pl #450**      **Kirkland** (City)   **WA** (State)   **98034** (Zip Code)

Phone:   **425-820-1947**      Fax:   **425-820-9360**

E-mail:   mnewman@firstlinesystems.com

WA State Contractor's Registration #:   **FIRSTSI147MG**

Federal Tax ID #:   **91-1339884**

**UNION:**
IUPAT DISTRICT COUNCIL 5

By: _(Signature)_   John Boutfeud (Print Name)

Title: Business Representative      Date: 8/8/16

## SIGNATURE PAGE

2016 – 2019

Western Washington Area Agreement

for the Drywall Industry

between

the International Union of Painters and Allied Trades District Council 5

and

the Signatory Employer

**EMPLOYER:**

Name of Company: Gordon Brown Associates, Inc.

By: _(Signature)_     Jeffrey G. Brown _(Print Name)_

Title: Owner     Date: 8/8/16

Address: 20606 84th Ave S.   Kent _City_   WA _State_   98032 _Zip Code_

Phone: 253-872-8338     Fax: 253-872-8448

E-mail: Jeff @ Gordon brown associates . com

WA State Contractor's Registration #: Gordo BA 077 RA

Federal Tax ID #: 91-1615252

**UNION:**
IUPAT DISTRICT COUNCIL 5

By: _(Signature)_     John Dutford _(Print Name)_

Title: Business Representative     Date: 8/8/16

# SIGNATURE PAGE

## 2016 – 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

EMPLOYER:

Name of Company:  KHS&S Contractors, Inc.

By: _____     Shawn Martin
         (Signature)                          (Print Name)

Title: Senior Vice President                Date:  8/30/2013

Address:  22614 66th Ave. South Suite 105      Kent       WA       98032
                                                 City         State      Zip Code

Phone:  253-922-3445               Fax:  253-922-3368

E-mail:  Shawn.martin@khsswest.com

WA State Contractor's Registration #:  KHSSC-990NZ

Federal Tax ID #:  58-2279196

UNION:
IUPAT DISTRICT COUNCIL 5

By: _____     _____
        (Signature)                              (Print Name)

Title:  Business Representative           Date:  8/8/16

opeiu#8/afl-cio

# SIGNATURE PAGE

### 2016 – 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

**EMPLOYER:**

Name of Company:   **Mehrer Drywall**

By: _____          **Kurt Mehrer**
                 (Signature)                                              (Print Name)

Title:   **President**                                                      Date:   **8/8/2016**

Address:   **2657 20th Avenue West**              **Seattle**        **WA**        **98199**
                                                                        City            State        Zip Code

Phone:   **(206) 282-4288**                          Fax:   **(206) 285-2092**

E-mail:   **kurt@mehrer.com**

WA State Contractor's Registration #:   **MEHRED*324RT**

Federal Tax ID #:   **91 0756937**


**UNION:**
IUPAT DISTRICT COUNCIL 5

By: _____          _____
                 (Signature)                                              (Print Name)

Title:   Business Representative          Date:   8/8/16

open#8/afl-cio

# SIGNATURE PAGE

## 2016 – 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

**EMPLOYER:**

Name of Company: _Miller & Sons INC_

By: _____ (Signature)   _Andrew P. Miller III_ (Print Name)

Title: _V/P_   Date: _8/8/16_

Address: _PO Box 112_   _Olympia_ City   _WA_ State   _98507_ Zip Code

Phone: _360 357 5957_   Fax: _360 786 1780_

E-mail: _AndyJr @ millerandsonsoly . com_

WA State Contractor's Registration #: _MILLEST141MA_

Federal Tax ID #: _91-0720137_

**UNION:**
IUPAT DISTRICT COUNCIL 5

By: _____ (Signature)   _John Bufford_ (Print Name)

Title: _Business Representative_   Date: _8/8/16_

opeiu#8/afl-cio

# SIGNATURE PAGE

## 2016 - 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

**EMPLOYER:**

Name of Company: _NELSON Construction Inc._

By: _(Signature)_ _Lynn R. Frederick_ (Print Name)

Title: _President_ Date: _8-23-2016_

Address: _P.O. Box 1915_ _Auburn_, _WA_, _98071_
City State Zip Code

Phone: _253 931-6696_ Fax: _253 931-8077_

E-mail: _Skye@nelsonconstructionINC.com_

WA State Contractor's Registration #: _NELSOC *21656_

Federal Tax ID #: _91-0988858_


**UNION:**
IUPAT DISTRICT COUNCIL 5

By: _____ _(Signature)_ _John Batford_ (Print Name)

Title: _Business Representative_ Date: _8/8/16_

opeiu#8/afl-cio

# SIGNATURE PAGE

## 2016 – 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

**EMPLOYER:**

Name of Company: **Northwest Partitions, Inc.**

By: _____      **James Kahler**
(Signature)                             (Print Name)

Title:   **Vice President**                    Date:  **August 8, 2016**

Address:  **20006 144th Ave NE**          **Woodinville    WA         98072**
                                             City            State       Zip Code

Phone:  **425-375-2500**                  Fax:  **425-375-2540**

E-mail:  **jkahler@nwpart.com**

WA State Contractor's Registration #:   **NORTHPI169QA**

Federal Tax ID #:  **91-1186247**


**UNION:**
IUPAT DISTRICT COUNCIL 5

By: _____      _____
(Signature)                             (Print Name)

Title:  _____      Date:  _____

opeiu#8/afl-cio

# SIGNATURE PAGE

## 2016 – 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

EMPLOYER:

Name of Company: _Olympic Interiors_

By: _Doug Bagnell (Signature)_ _Doug Bagnell (Print Name)_

Title: _Controller_ Date: _____

Address: _815 S. 336th St_ _Federal Way, WA 98003_
City / State / Zip Code

Phone: _253-926-5526_ Fax: _253-926-5589_

E-mail: _dougb@olympicint.com_

WA State Contractor's Registration #: _OLYMPII920NQ_

Federal Tax ID #: _26-3092030_


UNION:
IUPAT DISTRICT COUNCIL 5

By: _____ _John Barber_
(Signature) (Print Name)

Title: _Business Representative_ Date: _8/8/16_

opeiu#8/afl-cio

# SIGNATURE PAGE

## 2016 – 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

**EMPLOYER:**

Name of Company: **Partition Systems Incorporated**

By: _(Signature)_          **Steven J. Johnson**
                           (Print Name)

Title: **President**                  Date: **August 9, 2016**

Address: **12919 184th Drive SE**      **Snohomish**    **WA**    **98290**
                                         City         State     Zip Code

Phone: **425-412-4222**                  Fax: _____

E-mail: **stevej@partitionsys.org**

WA State Contractor's Registration #: **PARTISIO88LN**

Federal Tax ID #: **91-155-7920**


**UNION:**
**IUPAT DISTRICT COUNCIL 5**

By: _____        John Buttford
       (Signature)                      (Print Name)

Title: **Business Representative**       Date: **8/5/16**

_opeiu#8/afl-cio_

# SIGNATURE PAGE

### 2016 – 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

EMPLOYER:

Name of Company: **VANDERLIP AND COMPANY, INC.**

By: _____(Signature)_____     **AARON VANDERLIP**
(Print Name)

Title: **PRESIDENT**     Date: **08/23/2016**

Address: **14535 NE 91ST STREEET**     **REDMOND**     **WA**     **98052**
City     State     Zip Code

Phone: **435-885-4110**     Fax: **425-885-1068**

E-mail: **aaron@vanderlipco.com**

WA State Contractor's Registration #:     **VANDECI142C4** ·

Federal Tax ID #:     **91-1304609**

UNION:
IUPAT DISTRICT COUNCIL 5

By: _____(Signature)_____     John Botford
(Print Name)

Title: Business Representative     Date: 8/8/16

opeiu#8/afl cio

# SIGNATURE PAGE

### 2016 – 2019

### Western Washington Area Agreement

### for the Drywall Industry

### between

### the International Union of Painters and Allied Trades District Council 5

### and

### the Signatory Employer

**EMPLOYER:**

Name of Company:   **Western Partitions Inc.**

By:   _____          **Neil O'Connor**
       (Signature)                                           (Print Name)

Title:   **Director of Labor Relations**                    Date:   **Aug. 5, 2016**

Address:   **8300 SW Hunziker**            **Tigard**        **OR**        **97223**
                                City         State     Zip Code

Phone:   **503 620-1600**                         Fax:   **503 62 45 781**

E-mail:   **Neil.OConnor@WesternPartitions.com**

WA State Contractor's Registration #:   **WESTPI72P6**

Federal Tax ID #:   **93-0655225**


**UNION:**
IUPAT DISTRICT COUNCIL 5

By:   _____          John Button
      (Signature)                                           (Print Name)

Title:   Business Representative                Date:   8/8/16

*opeiu#8/afl-cio*

Exhibit B



NW WALL & CEILING CONTRACTORS ASSOCIATION

October 11, 2016

**Sent Via Fax & Certified Mail**
Mr. Denis Sullivan
Business Manager / Secretary-Treasurer
IUPAT District Council 5
6770 E. Marginal Way S., Bldg. E-321
Seattle, WA 98108

Re:    **Employer Grievance**

Dear Mr. Sullivan:

This letter will constitute a formal grievance filed on behalf of the Employers signatory to the Western Washington Area Agreement for the Drywall Finishing Industry and IUPAT District Council 5. District Council 5 has violated its commitment in Section 1.5 of that Agreement to require any non-signatory contractors performing work covered by that Agreement to pay an amount equal to the total Employer cost package under this Agreement. The grieving Employers seek any remedies appropriate to properly resolve this contract violation. Please direct all future correspondence on this grievance to me on behalf of the signatory Employers.

Sincerely,

Dick Mettler,
Executive Director,
Northwest Wall & Ceiling Contractors Association

cc:  John Bufford

## ARTICLE 1
## PREAMBLE & PURPOSE

1.1   This Agreement is between International Union of Painters & Allied Trades (IUPAT) District Council 5 ("Union") and Performance Contracting Incorporated ("Employer").

This Agreement shall be effective in the following Counties of Western Washington: Whatcom, Thurston, Snohomish, Skagit, San Juan, Pierce, Mason, Kitsap, King, Jefferson, Island, Grays Harbor, Clallam, and Lewis.

1.2   The Employer recognizes the Union as the exclusive bargaining agent for the purpose of collective bargaining on behalf of all employees engaged in drywall work.

1.3   The purpose of the Agreement is to establish harmonious relations and uniform conditions of employment and contributions to the Trust Plans between the parties hereto, to promote the settlement of labor disagreements by conference and arbitration, to prevent strikes and lockouts, to utilize more fully the facilities of the Apprenticeship Training Program, to promote efficiency and economy in the performance of drywall finishing, etc., and generally to encourage a spirit of helpful cooperation between the Employer and employee group to their mutual advantage and the protection of the investing public.

1.4   When, in the opinion of any party to this Agreement, certain work might be secured for Contractors signatory to this Agreement, and the present terms and conditions of work contained in this Agreement are not consistent with efficiency or practicality or the competitive position of the Contractors, then the terms and conditions contained in this Agreement may be modified to govern such project, geographical area or type of work. The consent, in writing, of the Union shall be required to modify said terms and conditions.

1.5   The parties to this Agreement recognize the Exterior and Interior Industry as a Specialty Market and the necessity of assuring the competitive position of the parties within the Exterior and Interior Industry during the term of this Agreement. In the event the Union negotiates a contract with any other contractor covering work scopes in this Agreement as defined in Article 2 (Scope of the Agreement) (excluding any Residential Agreement, Single/Special Project Agreement, Market Recovery Program funded projects and District Council 5 Maintenance Agreements) which has more favorable economic terms, then the Employer hereunder will have the benefit of any such favorable terms. Any signatory contractors performing work scopes covered by this Agreement shall be required by the Union to pay an amount equal to the total employer cost package under this Agreement.

1

*IUPAT DC 5 / Performance Contracting Inc. · Western Washington Area Agreement for the Drywall Industry*
*July 1, 2016 - June 30, 2019*



International Union of Painters & Allied Trades, AFL-CIO

# DISTRICT COUNCIL #5

**Denis Sullivan**
*Business Manager*

Alaska • Idaho • Oregon • Utah • Washington

6770 E. Marginal Way S., Bldg E - Suite 321   •   Seattle, WA 98108   •   206 441-5554   •   1 800 443-9303   •   Fax 206 448-6478

### Memorandum of Understanding

#### between

#### International Union of Painters & Allied Trades District Council 5/Local Union 364
#### (Union)

#### and

#### Performance Contracting Incorporated
#### (Employer)

Effective July 1, 2016, the parties agree that in lieu of the Employer contributing to the NWCCA Industry Fund, Performance Contracting Incorporated shall establish an Industry Fund for the purpose of providing for drug testing, safety training and all other training and operations support for Performance Contracting Incorporated employees working under the CBA and to defray Employer costs related to bargaining and to services provided to the Employer by the Northwest Wall & Ceiling Bureau.

The Union and the Employer agree the Industry Fund shall be Employer-administered and funded through an Employer contribution of $0.35 per compensable hour for each employee working under the CBA. The Union and the Employer agree that the Industry Fund shall be paid as per Article 21 of the CBA and shall be used only for the purposes outlined in this Memorandum of Understanding.

The Union and the Employer agree that the Trust Office will disperse the funds to the Employer on a monthly basis.

PERFORMANCE CONTRACTING INCORPORATED:

_____
Employer Signature

_Bo L. Ebbinghouse, VP Gen. Couns._
Printed Employer Name & Title

_9/16/16_
Date

IUPAT DISTRICT COUNCIL 5/ LOCAL UNION 364:

_____
Union Signature

_John Burford  Business Representative_
Printed Name & Title

_9/16/16_
Date

*opeiu#8/afl-cio*

Exhibit C

```
IN THE MATTER OF THE ARBITRATION  )           ARBITRATOR'S
                                   )
BETWEEN                            )        OPINION AND AWARD
                                   )
INTERNATIONAL UNION OF PAINTERS    )
AND ALLIED TRADES DISTRICT COUNCIL )
"IUPAT DISTRICT 5" OR "THE UNION"  )
                                   )
AND                                )
                                   )
EMPLOYERS OF NORTHWEST WALL &      )
CEILING CONTRACTORS ASSOCIATION    )     CONTRACT INTERPRETATION
"NW WALL & CEILING" OR EMPLOYER"   )            GRIEVANCE
```

HEARING:  August 10, 2018
          Seattle, WA

HEARING CLOSED:  September 14, 2018

ARBITRATOR:       Timothy D.W. Williams
                  2700 Fourth Ave #305
                  Seattle, WA

REPRESENTING THE EMPLOYER:
     Christopher L Hilgenfeld, Attorney

REPRESENTING THE UNION:
     Dmitri Iglitizen Attorney
     John Boufford, Elected Representative Council 5

APPEARING AS WITNESSES FOR THE EMPLOYER:
     Neil O'Connor, Western Operations LR Director
     Rick Harris, General Manager Performance Contracting, Inc
     Terry Kastner, NW Wall & Ceiling
     Kurt Mehrer, President Mehrer Drywall
     Ray Baca, NW Wall & Ceiling, Executive Director
     Marty Holding, Expert Drywall


APPEARING AS WITNESS FOR THE UNION:
     John Boufford, Elected Representative Council 5

## EXHIBITS

### Joint

1.  IUPAT DC 5 – Western Washington Area Agreement for the Drywall finishing Industry, 2016-2019
2.  Signature Page 2016 – 2019 Western Washington Area Agreement for the Drywall finishing Industry
3.  NWCCA Signatory Employers & 1.5 Grievance, 10/11/16
4.  NWCCA Notice to IUPAT of Request for FMCS arbitration Panel, 4/7/17

### Union

1.  IUPAT & PCI, 2/5/18
2.  MOU Offer, 1/12/17 unsigned
3.  Email string ending 6/22/16
4.  Letter to Boufford, 6/19/17
5.  Schedule A increase, 6/23/17
6.  Gangle Decision, 4,26.17
7.  Email to Rick Harris, 7/1/17
8.  Email to Ray Baca, 11/11/17
9.  Letter to Chris Hilgenfeld, Atty 1/17/18
10. Request for response by letter, 2/20/18
11. Letter to Dmitri Iglitzin, Atty 2/27/17
12. Letter to Boufford, 6/13/18
13. Agenda for L/M meeting, 7/20/18

### Employer

1.  Western Washington Area Agreement for the Drywall Industry with IUPAT DC 5, 2013 – 2016
2.  IUPAT DC 5 - Western Washington Area Agreement for the Drywall Finishing Industry and Performance Contracting Incorporated, 2016 – 2019
3.  NWCAA & Tapers Negotiations Meeting on 5/18/16 Attendance Record
5.  NWCCA & Tapers Negotiations Meeting 6/07/16 Attendance Record
6.  Management Proposal 1 (Article 1 Section 1.5) – NWCCA & IUPAT Drywall Finishers Negotiations 6/7/16
7.  NWCCA & Tapers Negotiations Meeting 6/21/16 Attendance Record
8.  Amended Management Proposal 1 (Article 1 Section 1.5) – NWCCA & IUPAT Drywall Finishers Negotiations
9.  6/21/16 Wage Proposal (T/A)

10. NWCCA/Drywall Finishers Negotiations 2016 Summary of Items Tentatively Agreed Upon Union Ratification Vote, 7/19/16
11. Email correspondence between WT Grimm (Attorney for NWCCA) & Dmitri Iglitzin (attorney for IUPAT DC 50 RE: Wage proposal language, June 2016
12. NWCCA Joint Labor Management Committee – Grievance Actions/Procedures Meeting, 1/12/17
13. NWCB ("Northwest Wall & Ceiling Bureau") Technical Document Gypsum Wallboard – "Control Joint Placement for Gypsum Board Assemblies"
14. Claddings and Design of Exterior Envelope to Meet the 2012 Energy Code, Presentation by Terry Kastner, NWCB
15. NECB Site Investigation Report, January 17, 2013
16. NWCCA/NWCB Industry Funding budget
17. Performance Contracting Inc. Letter RE: Rescission of Membership and Signatory Authority, 5/16/16
18. Schedule A, 7/1/16 – 6/30/17
19. PCI Hours in Seattle, 7/16 – 8/18
20. PCI Industry Fund Reimbursement
21. PCI Industry Fund Reimbursement checks
22. Email to J. Boufford, 9/2/16
23. Tapers Only Cost Worksheet, 6/16 – 7/18
24. Hours of Work by Employers
25. Hours of Work by Craft
26. Expenditures NWCCA 7/1/16 – 6/30/18
27. Letter to Sullivan, 4/12/17
28. Schedule A 7/1/18 – 6/30/19
29. Email string Rich Harris ending 9/6/16
30. Letter to Christopher Hilgenfeld, Atty 4/10/17
31. NLRB filing 4/5/17
32. NLRB withdrawal of charge 6/30/17
33. UFLP, 5/1/17
34. Withdrawal of charge, 6/1/17
35. Letter to select Arbitrator, 1/11/18
36. Letter to Dmitri Iglitzin, Atty. 2/27/18

## BACKGROUND

International Union of Painters and Allied Trades District Council 5 (hereafter "IUPAT" or "the Union") and Employers of Northwest Wall & Ceiling Contractors Association (hereafter "Association" or "NWCCA") agreed to submit a dispute to arbitration.   A hearing was held before Arbitrator Timothy Williams in Seattle, Washington on August 10, 2018.   At the hearing, both Parties had full opportunity to make opening statements, examine and cross-examine sworn witnesses, present documentary evidence, and make arguments in support of their positions.

The Arbitrator made an audio recording of the hearing in a digital format as a part of his notes.   A copy of the recording was sent to each Party as an attachment to an e-mail message.

At the close of the hearing, the Parties were offered an opportunity to provide arguments in the form of post-hearing briefs.   Both parties provided written arguments which were timely received by the Arbitrator.   Thus the award, in this case, is based on the written evidence, the testimony provided during the hearing and the Parties' arguments.

## SUMMARY OF THE FACTS

The grievance in this case is between the IUPAT District Council #5 (Union) and Employers of Northwest Wall & Ceiling Contractors Association (Association or NWCCA). The parties are bound by a collective bargaining agreement effective from July 1, 2016 -June 30, 2019. The following is a brief summary of the events that led up to the filing of the grievance and the ultimate decision to submit the grievance to arbitration. It is based on both documentary and testimonial evidence presented during the hearing.

The NWCCA negotiated an Industry labor agreement (2016-19) that has sixteen signatory contractors. That agreement contains what is often referred to as a most favored nations clause protecting the Contractors against the Union entering into an agreement with a competing contractor that contained more favorable financial terms. Specifically Article 1.5 provides in pertinent part:

> Any signatory contractors performing work scopes covered by this Agreement shall be required by the Union to pay an amount equal to the total employer cost.

Performance Contracting Incorporated (PCI) withdrew its membership from NWCCA prior to the completion of the negotiations over the Industry 2016-19 agreement and is not signatory to that agreement. Following the completion of the negotiations over the 2016-19 Industry agreement, the Union

entered into negotiations with PCI and ultimately signed a separate PCI agreement that was essentially similar in all respects to the Industry agreement.  Similar, with one significant exception, the Industry agreement required signatory contractors to make a $.35 contribution per compensable hour of bargaining unit work to the Industry Fund.  The Industry Fund supports the NWCCA and the Northwest Wall and Ceiling Bureau (Bureau).  The PCI agreement calls for a $.35 contribution to an industry fund where the $.35 contribution is self-administered by PCI.

From the Association's perspective, the PCI industry fund constitutes a kickback of $.35 per work hour to PCI allowing it to use that money to offset overhead costs.  The ability to use the industry fund to offset overhead constitutes a "more favorable" economic term and thus the Contractors are entitled to the benefit of such "favorable terms."

By letter dated October 11, 2016, the Contractors filed a grievance over the "fictitious PCI-Fund" (E Br 2) claiming a violation of the favored nations clause.  Specifically that letter reads:

> This letter will constitute a formal grievance filed on behalf of the Employers signatory to the Western Washington Area Agreement for the Drywall Finishing Industry and IUPAT District Council 5.  District Council 5 has violated its commitment in Section 1.5 of that Agreement to require any non-signatory contractors performing work covered by that Agreement to pay an amount equal to the Employer the total

Employer cost package under this Agreement.  The grieving Employers seek any remedies appropriate to properly resolve this contract violation.  Please direct all future correspondence on this grievance to me on behalf of the signatory Employers. (J 3)

Ultimately the Parties were unable to resolve their differences over the matter that had led to the filing of the grievance and the issue was submitted to arbitration. Arbitrator Timothy Williams was selected for the purpose of providing resolution to the issue in dispute and this document constitutes his final analysis and award.

## STATEMENT OF THE ISSUE

The Parties were unable to agree on a statement of the issue.  The Employer provided a written statement at hearing and the Union provided a statement as part of its brief.  The Employer's statement reads as follows:

1.   Did IUPAT District Council 5 violate Section 1.5 of the Western Washington Area Agreement for the Drywall Industry ("Labor Agreement') by allowing a non-signatory employer to perform work covered by the Labor Agreement and pay less than the total employer cost package as outlined in the Labor Agreement?

2.   If so, what is the appropriate remedy for the signatory-employers?

Union's statement:

1.   Did IUPAT District Council 5 breach the most favored nations clause of the CBA by entering into a contract with PCI which required PCI to contribute 0.35 per hour to its own industry fund, in contrast to the terms of the CBA that require each Employer to contribute to the industry fund

controlled by NWCCA, even though the total economic cost package imposed on the Employers through the CBA is no greater than the total economic cost package imposed on PCI through the Union-PCI contract, and even though the Union offered identical terms to the Employers that it gave to PCI?

2.   If so, what is the proper remedy in light of the fact that the Employers presented no evidence that they incurred any actual economic harm as a result of the alleged competitive advantage they suffered as the result of the Union's alleged breach, (e.g. lost projects or profits), and did not assert that they suffered such economic harm?

The Arbitrator has regularly found that the issue statement should not express as a fact matters that are in dispute between the Parties.   Rather, the issue statement should remain neutral on these matters.   Disputed facts should be dealt with as part of the award itself.   Thus, the Arbitrator frames the issue as follows:

1.   Did the IUPAT District Council 5 violate Article 1.5, the most favored nations clause, of the Parties 2016-19 collective bargaining agreement by the terms of a separate agreement it signed with Performance Contracting Incorporated?

2.   If so, what is the appropriate remedy?

The Parties agreed that the grievance was properly before the Arbitrator for a decision on the merits.

## APPLICABLE CONTRACT LANGUAGE

I.   **IUPAT DISTRICT COUNCIL 5 – WESTERN WASHINGTON AREA AGREEMENT FOR THE DRYWALL FINISHING INDUSTRY, 2016 – 2019**

### ARTICLE 1

### PREAMBLE & PURPOSE

     \* \* \*

1.3  The purpose of the Agreement is to establish harmonious relations and uniform conditions of employment and contributions to the Trust Plans between the parties hereto…

\* \* \*

1.5  The parties to this Agreement recognize the Exterior and Interior Industry as a Specialty Market and the necessity of assuring the competitive position of the parties with the Exterior and Interior Industry during the term of this Agreement.   In the event the Union negotiates a contract with any other contractor covering work scopes in this Agreement as defined in Article 2 (Scope of the Agreement) (excluding any Residential Agreement, Single/Special Project Agreement, Market Recovery Program funded projects and District Council 5 Maintenance Agreements) which has more favorable economic terms, then the Employers hereunder will have the benefit of any such favorable terms.   Any signatory contractors performing work scopes covered by this Agreement shall be required by the Union to pay an amount equal to the total employer cost.

### ARTICLE 2
### SCOPE OF ATREEMENT

2.1  Drywall work as that term is used in this Agreement includes but is not limited to the following: All steps to execution of drywall finishing, spackling of all surfaces and application of texture finishes where adhesive materials are used, thin wall, radiant heat fill and preparatory work of spotting, taping, finishing and sanding of joints and surfaces. ………

## ARTICLE 3
## RECOGNITION & BARGAINING UNIT

3.2.1    Employers covered by this Agreement shall be free to
designate their own representative for the purpose of
collective bargaining; however, such designation shall
not affect the Employer's right or obligation to make
Trust or Fund contributions required by this
agreement.

## ARTICLE 4
## DEFINITIONS

4.1   The term "Employer" refers to any person who has agreed, in
writing, to comply with the terms of this Agreement and
included any person acting as an agent of the Employer,
directly or indirectly.  The term "person: includes one or
more individuals, partnerships, associations, corporations,
joint ventured, legal representatives, trustees, trustees
in bankruptcy or receivers.

## ARTICLE 5
## RIGHTS OF THE PARTIES

5.1   The Union retains all rights except as those rights are
limited by the express and specific language of this
written Agreement.  Nothing anywhere in this Agreement
shall be construed as to impair the right of the Union to
conduct its affairs in all particulars except as expressly
and specifically modified by the express and specific
language of this written Agreement.  It is further agreed
that noting contained in this Agreement shall be construed
as limiting the Union's right to control its internal
affairs and discipline its members who have violated the
Union's Constitution and Bylaws, or who have violated the
terms of this Agreement, or who have crossed or worked
behind an IUPAT District Council 5, its affiliated or
affiliations authorized primary picket line, including but
not limited to such a picket line at the Employer's
premises or job site where the Employer is engaged in
drywall work.  This Section is not intended and shall not
be construed to authorize any conduct that is proscribed by
the National Labor Relations Act.

**ARTICLE 6**
**GRIEVANCE PROCESURE/LABOR-MANAGEMENT BOARD**

6.1  Except as expressly otherwise provided in this
     Agreement, …all grievances or disputes between the
     Union and the Employer, arising during the terms of
     this Agreement, shall be settled in accordance with
     the provisions of this Article…

                            ***

6.5  …The arbitrator chosen will be authorized to hear the
     dispute or grievance submitted to him and his decision
     shall be final and binding.  The arbitrator's fee
     shall be paid by the party who loses the case.  The
     impartial umpire may, in his discretion, allocate the
     fee between the Union and the Employer or NWCCA if he
     believes that the Union, the Employer, nor the NWCCA
     substantially prevailed.

**ARTICLE 19**
**WAGES & CLASSIFICATIONS**

19.4.

     b.  If the Union enters into an Agreement applicable
         to work covered by this Contract which contains
         lesser wages or fringe benefits than provided
         herein, the Employer parties to this Contract
         shall be permitted to pay such lesser wages or
         benefits; provided, however, that this paragraph
         shall not be applicable to a single job
         Agreements which the Union enters into for the
         purpose of permitting an Employer party to this
         Contract to compete against a nonunion Contractor
         or to a targeted Market Recovery Job Site.

19.14 Wages and Benefits

Journeyman Drywall Finisher (Taper)

|  | July 1, 2016 | July 1, 2017 | July 1, 2018 |
|---|---|---|---|
| Hourly Wage | $38.55 | | |
| Health & Welfare | $7.14 | | |
| IUPAT Pension | $4.87 | **+$1.67/hr** | **+$1.84/hr** |
| WW Pension | $4.10 | **on** | **on** |
| Industry Fund | $0.35 | **7/1/2017** | **7/1/2018** |

```
Apprenticeship Program      $.50
LMCF                        $0.05
Total Package               $55.66     $57.33        $ 59.17
```

## ARTICLE 21
## TRUSTS

21.1 Each Employer signatory to this Agreement is required to make reports to the Trusts (see Article 22) and remit with contributions, if any, due to Western Washington Pension Trust… (hereafter called the central distribution point)….

21.3 By entering into this Agreement, the Employer adopts and agrees to be bound by the terms of the Trust Agreements establishing the Funds referred to in this Article and agrees to be bound by all past and future lawful acts of the Trustees of each such Fund.  The Employer shall not be bound by the terms of any Trust Agreement or the actions of the Trustees of any Trust Fund unless the Employer is obligated to make contributions to such Fund pursuant to this Contract.

21.10   No Industry Funds shall be expended by the NWCCA for any of the following purposes:

    a.  Lobbying in support of anti-labor legislation.

    b.  The subsidizing of the NWCCA or Contractors during a period of authorized strike or lockout.

    c.  Payments directly or indirectly to any Union, representative of any Union, or representative of any employees employed by any person required to make contributions to the benefit of any individual Employer, or to the operation and maintenance of the NWCCA provided, however that any such representative of the NWCCA and the NWCCA itself  may be paid in such sums as are reasonable and equitable for actual services rendered in connection with any authorized purposes.

    d.  Any purpose which is contrary to existing law.

21.11   Accounting of expenditures of Industry and Specifications Funds shall be available to the NWCCA, IUPAT District Council 5 and/or Unions upon request.

## ARTICLE 22
## TRUST FUNDS BENEFIT LEVELS

22.4 Commencing on July 1, 2016, the Employer agrees to pay on or before the fifteenth (15th) of each month thirty-five cents ($0.35) per compensable hour to establish and provide continuing financial support to an Employer-administered Industry Fund to provide for drug testing and safety training for employees working under this Agreement and to defray Employer costs related to bargaining and to services provided to the Employer by the Northwest Wall & Ceiling Bureau.


**II. Western Washington Area Agreement Between PCI and IUPAT DC 5 (2016-2019)**

ARTICLE 19: WAGES AND CLASSIFICATIONS

19.14 Wages and Benefits

Journeyman Drywall Finisher (Taper)

|                        | July 1, 2016 | July 1, 2017 | July 1, 2018 |
|------------------------|--------------|--------------|--------------|
| Hourly Wage            | $38.55       |              |              |
| Health & Welfare       | $7.14        |              |              |
| IUPAT Pension          | $4.87        | **+$1.67/ hr** | **+$1.84 / hr** |
| WW Pension             | $4.10        | **on**       | **on**       |
| Industry Fund          | $0.35        | **7/1/2017** | **7/1/2018** |
| Apprenticeship Program | $0.50        |              |              |
| LMCF                   | $0.05        |              |              |
| Total Package          | $55.66       | $57.33       | $ 59.17      |


**ARTICLE 21: TRUSTS**

21.3 By entering into this Agreement, the Employer adopts and agrees to be bound by the terms of the Trust Agreements establishing the Funds referred to in this Article and agrees to be bound by all past and future lawful acts of the Trustees of each such Fund. The Employer shall not be bound by the terms of any Trust Agreement or the actions of the Trustees of any Trust Fund unless the Employer is obligated to make contributions to such Fund pursuant to this Contract.

21.10  No Industry Funds shall be expended by the Employer for any of the following purposes:

    a.   Lobbying in support of anti-labor legislation.

    b.   The subsidizing of the Employer during a period of authorized strike or lockout.

    c.   Payments directly or indirectly to any Union, representative of any Union, or representative of any employees employed by any person required to make contributions to the benefit of any individual Employer, or to the operation and maintenance of the Employer, provided, however, that any representative of the Employer and the Employer itself may be paid such sums as are reasonable and equitable for actual services rendered in connection with any authorized purposes.

    d.   Any purpose which is contrary to existing law.

21.11  Accounting of expenditures of Industry and specifications Funds shall be available to IUPAT District Council 5 and/or Unions upon request.


ARTICLE 22: TRUST FUND BENEFIT LEVELS

22.4  Commencing on July 1, 2016, the Employer agrees to pay on or before the fifteenth (15th) of each month thirty-five cents ($0.35) per compensable hour to establish and provide continuing financial support to an Employer-administered Industry Fund to provide for drug testing and safety training for employees working under this Agreement and to defray Employer costs related to bargaining and to services provided to the Employer by the Northwest Wall & Ceiling Bureau.


## POSITION OF THE ASSOCIATION

The Association begins its arguments by recognizing that it has the burden of proof in this proceeding. Citing arbitral authority, the Association concludes that its burden is met when it presents a preponderance of evidence. The Association

strongly asserts that it has more than met this burden of proof.

Turning to the specifics of its case, the Association contends that the plain meaning of the Industry contract and the intent of the Parties when they negotiated the contract clearly support the grievance. The specifically articulated intent of the Parties was to create a level financial field so that the labor contract did not provide any competitor an economic advantage. That is why the language of Article 1.5 requires the consideration of the total Employer cost package. By agreeing to this language, the Union was obligated to make sure that all labor contracts in the wall and ceiling jurisdiction would pay the same total Employer costs; a competitor would not get a better financial deal.

The Employer recognizes that the PCI labor agreement does contain a contribution to an industry fund but it is not the legally recognized Industry Fund. The legally recognized Industry Fund promotes the industry as a whole, is under the direction of an independent Board and does not operate just to benefit a single contractor. The PCI industry Board is directed by PCI and has the exclusive function of providing benefits that reduce the overhead of PCI. Thus, an industry fund contribution by PCI to its own industry fund does not constitute an Employer cost. As a result, this contribution does not result in a level economic field but rather serves as an advantage to this

competitor.

Since the labor contract that the Union signed with PCI gives PCI an economic advantage, that advantage violates the favored nations clause (Article 1.5) found in the drywall finishing Industry CBA.  Most important, the Union's offer to allow the contractors to stop contributing to the Industry Fund and create their own individual industry funds does not fulfill the Union's obligation under the terms of Article 1.5.  It was never the intent of the Parties when they negotiated the language of Article 1.5 to require a signatory contractor to leave the NWCCA in order to get the enhanced economic terms provided by the Union to a competitor contractor.  Clearly, the Union has violated the requirement of Article 1.5 and damages should be paid.

As for damages, the Association asks that the Union be required to pay the difference in the total cost package. PCI benefitted by using 89.7% of its industry fund payment to reduce its overhead.  The Union should be required to compensate the signatory contractors for lost profits and permit each of them to choose how to reduce their economic costs by an amount similar to what the Union granted PCI.  In addition, since the Union's action clearly constituted bad faith, the Union should be required to pay the Arbitrator's fees and pay the Association attorney's fees.

## POSITION OF THE UNION

The Union strongly disagrees with the position of the Association and presents its case with six primary arguments. First, the Union emphasizes that it did not breach the requirement of Article 1.5 because the economic terms of the PCI agreement are exactly identical to the economic terms of the Industry agreement.  Specifically, as related to the accusations of the Association, both contracts call for a payment of $.35 to an industry fund.  Moreover, PCI's industry fund is controlled by an MOU that places specific limitations on how the money can be spent.  Those limitations closely parallel the services and benefits that are available to the Association Contractors through their payment to the Industry Fund.

Second, even if the Arbitrator were to find that the PCI contribution to its own industry fund provided an enhanced economic benefit, the language of Article 1.5 does not bar the Union from reaching such an agreement.  Rather, the language requires that if such an agreement is reached, the economically beneficial terms must be offered to the Contractors signatory to the Association Industry agreement.  The Union first made such an offer verbally to the executive director of the NWCCA and then provided that offer in writing at a grievance meeting. Thus, the Union has fully met its obligation under the requirements of Article 1.5.

Third, the Union looked specifically at the language found in Article 1.5 that provides "Any signatory contractors performing work scopes covered by this Agreement" and notes that PCI was not signatory to "this agreement" but negotiated its own agreement. Therefore, by the clear meaning of the language of Article 1.5, PCI was not obligated to pay an exactly equal economic package.

Fourth, the Union agreement with PCI does not run contrary to the express purpose of the Association Industry agreement that requires uniform contributions to the trust funds that are recognized in the agreement (Article 1.3 and 22.2). The Industry Fund is not a trust fund and it is run by the Association for the exclusive benefit of Association members. Unlike the trust funds recognized in the Association Industry agreement, the Union has no representation on the Industry Fund. Thus, the Association industry agreement does not place a burden on the Union to ensure that PCI make uniform contributions to the Industry Fund.

Fifth, the Association filed a similar grievance against another labor union and received a favorable arbitration decision. The Union urges the Arbitrator to give little deference to that arbitration award because the most favored nation language found in the Association agreement with IUPAT #5 differs substantially from the language addressed in the

arbitration decision.  Also, the Union urges the Arbitrator to distance himself from that award since it suggests that the plain language of the agreement can be ignored.

Finally, the Union strongly emphasizes that even if the Arbitrator were to find the Association's case to have merit, the Association seeks a remedy that is outside the terms of the agreement and would constitute an unreasonable windfall for the Association Contractors.  The Union notes that none of the Contractors ever claimed that they have been damaged by the Union's action and that there is no possible way to actually calculate any losses that resulted from PCI submitting its industry fund payment to a self-administered industry fund.

As a concluding point, the Union urges the Arbitrator to deny the grievance and assign the cost of the arbitration process to the Association.

## ANALYSIS

The Arbitrator's authority to resolve a grievance is derived from the Parties' collective bargaining agreement (CBA) and the issue that is to be decided.  The pertinent language is found in Article 1.5 of the Industry CBA and reads as follows:

> Any signatory contractors performing work scopes covered by this Agreement shall be required by the Union to pay an amount equal to the total employer cost.

The term of the Industry Agreement commenced on July 1, 2016 and ends on June 30, 2019; the fiscal year for the contract being July 1 through June 30 of the following year.  Article 19 sets forth that the total compensable hour cost of the agreement is $55.66 the first fiscal year, $57.33 the second year and $59.17 the final year.  Included in the above monetary figures is an Industry Fund payment of $.35 per hour.

It is undisputed that PCI signed a separate labor contract[1] with IUPAT District Council 5 essentially similar in all respects to the Association Agreement and that PCI performs "work scopes covered by this Agreement."  The PCI agreement contains the exact same financial numbers including the $.35 industry fund payment.  The PCI industry fund payment, however, goes to a self-administered industry fund not the legally recognized Industry Fund[2].  The Association grieved claiming that the PCI industry fund simply involves a kickback where the money can be used to pay for general overhead – it is not a "cost."

---

[1] The Arbitrator is aware that the Union argues that PCI is non-signatory to "this Agreement" but is signatory to its own separate contract.  From this perspective, the separate contract with PCI does not have to "pay an amount equal to the total employer cost."  Only the 16 contractors that signed "this Agreement" are bound to the equal payment requirement.  The Arbitrator gave this some consideration but finds the Employer's counter argument better supported by the evidence and the more persuasive.  The language in question was clearly intended to bind any contractor that signed an agreement with IUPAT #5 and that performed "work scopes covered by this Agreement."  IUPAT's contract with PCI clearly meets this definition.
[2] Throughout this analysis the Arbitrator will use the capitalized "Industry Fund" to indicate the legally recognized fund that the contractors in general support versus the lower case "industry fund" that is the PCI self-administered fund.

Thus, from the Association's perspective, the PCI labor agreement allows PCI to pay less per hour – a violation of Article 1.5.

The issue before the Arbitrator reflects the above overview and is stated as follows:

Did IUPAT District Council 5 violate Article 1.5, the most favored nations clause, of the Parties 2016-19 collective bargaining agreement by the terms of a separate agreement it signed with Performance Contracting Incorporated?

The Arbitrator notes that this is a labor contract interpretation case where the Association, as the grieving party, carries the burden of proof. The Arbitrator concurs with the Association's claim that in a contract language interpretation case the appropriate burden is a simple preponderance of evidence. To sustain the grievance, therefore, the Association needs to provide a preponderance of evidence supporting its interpretation and application of the most favored nation provision found in Article 1.5.

The Arbitrator carefully reviewed the audio recording of the hearing, studied the documents that were submitted into evidence and thoroughly considered the arguments found in the Parties' briefs. The Arbitrator emphasizes that he carefully reviewed all of the points raised by the Parties in their briefs. Ultimately, he has chosen to focus the analysis on the arguments and evidence that he found weighed most heavily in the

final decision.   The fact that a contention or point is not discussed does not mean that it was not considered.   It does mean that it was not determined to be a major factor in arriving at the final conclusion.   The reasoning and the primary factors that led to the award are laid out in the following multi section analysis.

Total Employer Cost

The Association's grievance focuses on the last three words of the language found in Article 1.5: "total employer cost." The Association makes the point, uncontested by the Union, that this language was placed in the new collective bargaining agreement specifically to address the problem created when PCI ended its membership in NWCCA.   While PCI had a right to do so, the contractors that maintained their membership in NWCCA were concerned that the Union not enter into a separate labor agreement with PCI giving PCI an economic advantage.

The Association further points out the language in Article 19 which specifically grants to the signatory contractors in the Industry agreement the right to pay "lesser wages or fringe benefits," if the Union enters into an agreement with a competitor providing lesser wages or fringe benefits.   The Association uses the provision in Article 19 to illustrate the importance of the last sentence of Article 1.5.   The lesser

wages or fringe benefits language was a carryover from the old agreement and it obviously protected the signatory contractors from the Union entering into an agreement with a competitor contractor, such as PCI, where the competitor would be able to pay less for wages and benefits. The new language was specifically there to ensure that any competitor contractor's total hourly cost of compensation be equal to what the signatory contractors were paying. In order to do this, the industry fund contribution of $.35 had to be accounted for because the industry fund has nothing to do with wages and benefits even though it is listed as part of hourly compensation.

Specifically suggested to the Union is that if any contractor did not want to contribute to the Industry Fund, then there are six other items that make up total compensation and the objecting contractor can choose to simply increase the amount of any of these items by $.35 and that would make total cost of compensation equal. The specific example given is that the $.35 could have been added to the Apprenticeship Program[3]

---

[3] It does not surprise the Arbitrator that PCI would not agree to such an approach. As is discussed in other parts of this analysis, PCI chose to end its membership in NWCCA because it felt that the value of membership it was receiving, as the highest contributing member, did not equate. Rick Harris' testimony was quite clear, PCI had created a matrix which showed not only that PCI was not getting the value it should be; it also showed, from PCI's perspective, that other members of NWCCA were profiting at PCI's expense. PCI opposes making payment to something where it receives no benefit. Almost doubling the contribution to the Apprenticeship Fund in lieu of an Industry Fund contribution would have brought PCI no additional benefit over their regular contribution. To this Arbitrator, that appears to be a bad deal and one that PCI was highly unlikely to agree to.

with the objecting contractor paying $.85 per compensable hour as opposed to $.50.

It is undisputed that the 2016-19 Industry agreement was completed before the Union undertook separate negotiations with PCI.  Ultimately, what PCI agreed to was the exact same total compensation package found in the industry agreement including the payment of $.35 per compensable hour to the Industry Fund. Article 22.4 of the PCI agreement provides:

> Commencing on July 1, 2016, the Employer agrees to pay on or before the fifteenth (15th) of each month thirty-five cents ($0.35) per compensable hour to establish and provide continuing financial support to an Employer-administered Industry Fund to provide for drug testing and safety training for employees working under this Agreement and to defray Employer costs related to bargaining and to services provided to the Employer by the Northwest Wall & Ceiling Bureau.

The evidence clearly shows that PCI acted consistent with this provision as it issued the appropriate check at the middle of each month to cover the industry fund payment (E 19) which, from the Union's perspective, fully satisfied the requirements of the favored nations clause.  The check was issued to the *Employee Painters Trust*.  The Employee Painters Trust[4] then sent

---

[4] As the Arbitrator understands the system, the Employee Painters Trust served as a clearinghouse where all of the contractors sent their trust payments and the Employee Painters Trust then forwarded the correct amounts to the various accounts.  Thus, when the signatory contractors submitted their Industry Fund payment each month, that money would have been forwarded to NWCCA and/or NWCB.  Since PCI had set up its own Employer managed industry fund, that portion of PCI's monthly contribution related to the industry fund was sent back to PCI.

a check back to PCI for an amount equal to the monthly industry fund payment (E 21).

The CBA provides for a total package compensable hourly payment of $55.66 the first year, $57.33 the second and $59.17 the third year.  It is not disputed that PCI made those payments[5].  The issue that led to the Association grievance is that PCI's industry fund payment was sent back to PCI.  In its brief, the Association emphasizes its opposition and hostility to this arrangement by calling it a "fictitious" fund (p 2), "fictional" fund (p 12) and a "fictional employer plan" (p 29). Additionally, testimonial evidence indicates that the signatory contractors viewed the return of the money as a "kickback" (testimony of Mehrer).

Thus, from the standpoint of the signatory contractors, the return of the money to PCI to be used by PCI at its discretion does not create the level economic playing field that was negotiated and protected by the language of Article 1.5; therefore the grievance.

Industry Fund

The National Labor Relations Act (NLRA) grants to the Union the right to negotiate wages, hours and working conditions.  Any matter related to wages, hours and working conditions is

---

[5] Ultimately NWCCA decided to raise the industry fund payment by $.10 the second year and another $.05 the third year.  The evidence indicates that at the Union's request PCI agreed to match that increase.

considered a mandatory subject of bargaining.  The relationship between labor and management, however, is often times complex and there are issues or concerns that the Parties find beneficial to discuss and at times address in the CBA which are not mandatory.  These issues are usually called permissive[6].  A quick trip to the internet provides the following definitions:

> Permissive subjects of bargaining are those subjects over which the parties are not required to bargain.  They do not pertain to wages, hours and other terms and conditions of employment.  They may be proposed by either party, but neither party can insist upon the acceptance of such subjects as condition of executing a contract.
>
> * * * * *
>
> Permissive subjects of bargaining are those over which bargaining is neither compelled nor prohibited.  Neither party is required to agree to proposed language that is a permissive subject and the matter cannot be pursued to the point of impasse.  Although the parties may discuss permissive subjects and try to reach agreement, neither may, at any time, insist on the subject being incorporated into the contract.
>
> * * * * *
>
> Subjects that are neither mandatory nor illegal are classified as permissive subjects of bargaining.  While the list of possible permissive subjects is infinitely long, there are several distinct categories of commonly negotiated or proposed permissive subjects.  Some subjects of bargaining are classified as permissive because they represent efforts to negotiate on behalf of persons who are not part of the bargaining unit.  Additional topics are classified as permissive because they concern matters which are internal matters for either the union or management.

The Arbitrator realizes that what he has spelled out can be considered *Labor Relations 101* because it is such a basic part

---

[6] There are also issues that are prohibited but any discussion of prohibited subjects has no bearing on this award.

of the collective bargaining process. For the instant case, however, focusing on the concept of a permissive subject of bargaining is important because the Industry Fund is a permissive subject of bargaining. The Industry Fund is an internal management issue over which the Union has absolutely no control or input.

The financial terms found in the collective bargaining agreement for 2016-17 are as follows:

```
Hourly Wage               $38.55
Health & Welfare          $7.14
IUPAT Pension             $4.87
WW Pension                $4.10
Industry Fund             $0.35
Apprenticeship Program    $0.50
LMCF                      $0.05
```

The Union negotiates or has direct input into the hourly wage, the health and welfare contribution, the IUPAT pension contribution, the WW pension contribution, the apprenticeship program, and the LMCF rate. Not so for the industry fund. The Association tells the Union what the Industry Fund contribution will be and is free to unilaterally raise or lower that contribution at any time. This point is well known to the Association as is evidenced in a June 19, 2017 letter sent to the Union by Ray Baca, Executive Director of NWCCA. The letter reads:

> The individual employers have instructed the Association to increase the Industry Fund, effective July 1, 2017, to $0.45/hour. As you are aware, the Industry Fund is a non-

mandatory subject of bargaining, and is not deducted from
the employee's pay check.   The Association and the
individual employers are permitted to unilaterally increase
this contribution amount.   This unilateral right is also
consistent with the parties' past practice.   We intend to
send the raised Schedule A out to everyone this Friday,
June 23, 2017.   If the Union would like to meet and
discuss, please let me know. [citation omitted] (U 4)

Footnote 8 in the Association's brief provides as follows:

The Union's attorney has attempted to claim that the
Industry Fund was simply an employer-fund with no
connection to the bargaining process.   This is simply not
true.   It is true that the Industry Fund eventually goes to
the NWCCA (except, of course with PCI's contributions).
The industry fund as indicated by the Agreement's purpose
is a benefit to the entire industry, including the Union.
There is a significant benefit to all employers derived
from the promotion of the industry.   This benefit, however,
exists only so long as an employer is not disadvantage
economically in its existence.   (E Br 8)

The Arbitrator notes that, while there is substantial

reality in the claim that the Industry Fund indirectly benefits

the Union, it does not change the fundamental fact that the

industry fund is a permissive subject of bargaining, that

payment to the industry fund is completely controlled by the

Association – no Union involvement and that whatever benefits

are offered to the industry are set by the Association – again,

no Union involvement.

As to the fact that the Union and the employees that it

represents benefits from a healthy industry – that is quite

obvious.   John Boufford, testifying on behalf of the Union,

readily admitted that fact and emphasized that he routinely

works with non-signatory contractors to make sure that they are
contributing to the industry fund[7].   Moreover, his unrefuted
testimony is that in every case he has been successful with the
single exception of PCI.   PCI, of course, is the exception
because it withdrew its membership in NWCCA because PCI had
"lost its shared vision" with NWCCA regarding the cost of
membership and the services that were provided (testimony of
Rick Harris).

    While the Arbitrator will provide more extensive discussion
of the Industry Fund as a permissive subject of bargaining later
in this analysis, at the present point he will highlight two
important facts.   The first reemphasizes the absence of any
control on the part of the Union.   Not only does the Union have
no say in the amount of the Industry Fund payment, it equally
has no say in the services and benefits that accrue to the
Contractors from their membership in NWCCA.   The Second fact is
that while a subject may be permissive, when the Parties to a
labor agreement chose to place language covering the permissive
topic in the agreement, that language is just as binding on the

---

[7] The Arbitrator notes that at page 23 of its brief the Association emphasize
that the industry fund payment is a product of give and take negotiations and
that the Association "gave something up" in order to get this permissive
subject of bargaining in the CBA.   The Arbitrator is not convinced that
anything was given up in order to get the Fund in the collective bargaining
agreement; no specific evidence of such an exchange was provided.   The Union
seems to fully support having the Industry Fund in the agreement and its only
problems is with PCI; a problem that is simply an extension of PCI's conflict
with NWCCA.

Parties as is language covering mandatory subjects of bargaining.

Prior Arbitration Award

On June 20, 2017 Arbitrator Sandra Smith Gangle issued an award in what the Parties recognize to be a companion grievance. The Association, on behalf of the signatory contractors, had filed a grievance against Plasters and Cement Masons Local 528 claiming that the contract it had signed with PCI violated the favored nations clause found in the Association's contract with Local 528.

In general, labor arbitrators provide each award independent from the work of other arbitrators unless the term of a CBA specifically requires otherwise. From this perspective, the Arbitrator in the instant dispute is not bound to any conclusions or the award fashioned by Arbitrator Gangle. Yet, labor arbitrators are often equally sensitive to the fact that the Parties are not advantaged when they receive multiple awards providing conflictive end results.

In light of the above points, the Arbitrator has given thoughtful consideration to the decision of Arbitrator Gangle. This consideration fully took into account the various arguments put forth by the Parties as to what considerations ought be

given to the award particularly the Union's claim that pertinent language of the agreements are different.

The Arbitrator emphasizes from the outset that he is in agreement with much of what the Arbitrator Gangle provided, not including the remedy. One critical point in her decision, that this Arbitrator concurs with, was the finding that the creation of a self-administered industry fund did not, of itself, violate the most favored nations clause found in the Association agreement. Rather, it was the absence of independent oversight to ensure that fund monies were spent consistent with the express provisions of the agreement; PCI was left to say one thing and do something entirely different. Arbitrator Gangle writes:

> The facts tend to show that the Union did violate the "most-favorable-nations" clause of the NWCCA contract, but only in one particular. The evidence is clear that the Union allowed PCI to pay its "Industry Fund" contributions directly into a company-held "training" fund, which allowed the Company to use the funds that were deposited after July of 2016 at its own discretion without independent oversight. At the same time, however, the Union negotiated language in Article 1 showing that PCI was committed to "promote the plastering industry and encourage a spirit of helpful cooperation" with employee groups, "to their mutual advantage." Also, it negotiated an MOU with PCI that provided for the broader uses of the Industry Fund money than for internal training purposes alone. If PCI had followed those contractual requirements, this case might never have arisen. Unfortunately, however, the mere acceptance of PCI's desire to deposit its Industry Fund moneys to itself, so that it could control the use of the money, created an ambiguity in the PCI contract terms, which allowed PCI to avoid the commitments it stated in Article 1 and then clarified in the MOU. (U 6, p 18-19)

In other words, the real issue is not the fact that the Employee Painters Trust returns the industry fund money to the PCI administered industry fund, rather it is the extent to which that money is appropriately used and whether the Union is exercising sufficient oversight.  This analysis will continue by a fully exploring these factors.

PCI Industry Fund

The Arbitrator notes that there is, at times, a discernable level of frustration and hostility that is apparent at a labor arbitration hearing; each side feeling that it has been victimized by the other.  The instant case is an example of that fact.  The Union's opening statement clearly expressed this concern and Association witnesses openly expressed the opposite point of view.

Much of the Associations concerns are reflected in the conclusion that the Union participated in creating a bogus or fictitious *industry fund* as a method by which to avoid complying with the most favored nations clause; deliberate and willful malfeasance.  The Arbitrator finds the evidence does not support this conclusion.  The Union was simply faced with attempting to negotiate a contract with an Employer that had removed itself from membership in NWCCA and wanted no part in providing any financial support back to the Association.  Working with this

variable, the Union faced the very difficult task of trying to provide a level financial field while not getting involved in the ongoing hostilities between PCI and NWCCA.

The Arbitrator focuses the analysis on the assertion by the Association that:

> As explained by Neil O'Conner, the Union could have avoided breaching its NWCCA Agreement with the Grievant's by requiring PCI to pay an additional hourly contribution to the Union's Apprenticeship, or some other mandatory trust. (E Br 31)

The Association appears to forget that the Union was negotiating a labor agreement with PCI, it was not dictating the terms of a labor contract. It is true that the "Union's Apprenticeship, or some other mandatory trust" are mandatory subjects of bargaining and the Union could have bargained hard to achieve the end goal of having PCI make what in reality would have been a charitable contribution[8] to one of these trusts. However, Mr. Harris' testimony at hearing is very clear, PCI withdrew from NWCCA because of the conclusion of high cost, little benefit. One would expect, therefore, that he would strongly object to high cost – no benefit.

More importantly, PCI was willing to make all of the regular contributions to the mandatory issues of bargaining (the

---

[8] For example, the CBA required PCI to contribute $.50 to the Apprenticeship Program and PCI, like the other contractors, benefitted from the Apprenticeship Program. If PCI contributed $.85 an hour ($.50 + $.35), the additional payment brought no additional benefit back to PCI – thus a charitable contribution.

other 6 items of compensation); the only questionable item was the Industry Fund. How could PCI make an Industry Fund contribution without contributing to NWCCA? The answer, of course, was a self-administered industry fund where the monies were expended in a fashion consistent with an industry fund. The Arbitrator notes that there is nothing in the Industry collective bargaining agreement that would prohibit this action; the only issue being the creation of a level economic field.

Article 22.4 of the PCI agreement provides that the PCI industry fund would be expended "for drug testing and safety training for employees working under this Agreement and to defray Employer costs related to bargaining and to services provided to the Employer by the Northwest Wall & Ceiling Bureau." Additionally, the Union and PCI signed a memorandum of understanding on September 16, 2016 that provided in part:

> …Performance Contracting Incorporated shall establish an industry fund for the purpose of providing for drug testing, safety training and all other training and operations support for Performance Contracting Incorporated employees working under the CBA and to defray Employer costs related to bargaining and to services provided to the Employer by the Northwest Wall and Ceiling Bureau.
>
> …
>
> The Union and the Employer agree that the Trust Office will dispense the funds to the Employer on a monthly basis. (E 3)

Following the issuance of the Arbitrator Gangle award, the Union and PCI entered into a revised MOU. Mr. Boufford

testified that the new MOU was an effort to address issues raised by Arbitrator Gangle.  The revised MOU provided a more extensive statement about how the funds were to be expended and set in place a Labor-Management oversight committee.  The first paragraph of this MOU provides as follows:

> …Performance Contracting Incorporated (PCI) shall establish an independent fund (the Fund) for the purpose of promotional activities related to the Drywall Finishing Industry.  The fund is intended to provide for the costs associated with drug testing, respirator fit testing, hearing conservation testing and other industry and trade related testing and training for PCI employees working under the Collective Bargaining Agreement (CBA).  The Fund may also be allocated to defray employer costs related to collective bargaining and for services that may be provided by the Northwest Wall and Ceiling Bureau or other trade Association entities.  (U 1)

The Arbitrator emphasizes from the above paragraph the phrase "promotional activities related to the Drywall Finishing Industry."  The Arbitrator further points to the Gangle award in which she wrote, "If PCI had followed those contractual requirements, this case might never have arisen."  This Arbitrator is in total agreement with Arbitrator Gangle. Absolutely, had PCI expended some or all of the PCI industry funds to support promotional activities related to the Drywall Finishing Industry then there should not have been a grievance and there would have been no reason for this arbitration decision.

While much of what the Parties provided in the above MOU is a reasonable expenditure of monies consistent with the concept of an industry fund, the evidence indicates a complete lack of any expenditure that could be called promotional activities for the industry.  Most important, the Arbitrator concludes that money that should have been expanded on behalf of the industry was diverted to expenditures not consistent with an industry fund.  This divergence does constitute an economic advantage to PCI.  While the Arbitrator will have more to say about the lack of expenditures on behalf of the industry as a whole at a later point in this award, at this time he will simply emphasize his conclusion that this failure constituted a violation of Article 1.5 of the Industry agreement.

Benefit of Favorable Terms

At page 15 of its brief, the Union puts forth that Article 1.5 does not prohibit the granting of more favorable economic terms but rather requires that any more favorable economic terms be offered to the signatory contractors.  Specifically the Union argues:

> Article 1.5 of the agreement between the Union and the Association does not bar entering into an agreement with competitors of the Employer's that allegedly contains more favorable terms.  Rather, the agreement grants the Employer's "the benefit of any such favorable terms" "*in the event the Union negotiates a contract with any other contractor.*" [citations omitted]

The evidence is clear that both orally and in writing the Union offered[9] to provide to the signatory contractors the exact same right that was extended to PCI (set up your own industry fund and make your contribution to it) (U 2).  The Association calls this offer a "Hobson's choice" and strongly argues that the intention of Article 1.5 was not to put the signatory contractors into the position of having to destroy the Industry Fund in order to acquire the more favorable economic terms granted by the Union to a competitor contractor.  Moreover, Arbitrator Gangle in her decision labeled this offer as "illogical and unreasonable" from the standpoint of providing "a fair resolution of the grievance" (U 6, p 20).

This Arbitrator determines that the word illogical is better replaced with the word awkward.  Awkward, because the Parties struggle with the intermixing of a permissive subject of bargaining with mandatory subjects of bargaining.  The Arbitrator notes that the Association, in its brief, sites two other arbitration decisions in which damages were awarded the employers.  In one the arbitrator allowed a contractor to pay by piecework to the disadvantage of other contractors and in the other example the union agreed to defer a wage increase for one contractor for a one month period of time to the disadvantage of

---

[9] Marty Holding of Expert Drywall testified that he did not believe this was a serious offer.  The Arbitrator is puzzled by this response since the offer was made both orally and in writing.  Possibly, the fact that the offer seems disingenuous made it seem less serious.

others (E Br p 26-27).  This Arbitrator notes that in either case the issues were mandatory and the Union was in control of the decisions that were made.  In the instant case, the Union has no control over the quantity and quality of services provided by NWCCA.

The simple fact is that any one of the signatory contractors to the industry agreement could have taken advantage of the Union's offer.  If this potential contractor became dissatisfied with the services being provided by NWCCA, as PCI had, it could have withdrawn from membership in NWCCA and entered into negotiations midterm to modify the terms of the CBA consistent with what the Union provided to PCI.  It is doable.

The fact that it is doable, however, does not necessarily mean that it completely meets the terms of Article 1.5 of the Industry agreement.  As previously emphasized, this is an awkward mixture of different collective bargaining realities. The Industry Fund payment in the Industry agreement is a permissive subject of bargaining over which the Union exercised no control.  In the PCI agreement, the industry fund is placed under the control of the collective bargaining agreement including the MOUs and the control of a Labor-Management committee.

Having agreed to terms that required it to exercise control, the Union was required to do so in a way that ensured

the level economic field required by Article 1.5 of the Industry agreement.  The Union failed to fully do this which has led the Arbitrator to conclude that Article 1.5 was violated.  Had the Union ensured that the PCI industry fund was properly expended, then it could have offered a similar self-administered industry fund to the signatory contractors.  What it could not do is offer a flawed, self-administered industry fund to the signatory contractors.  Since the offer was flawed, a point that will be elaborated on further in this award, the offer was not sufficient to satisfy the requirements of Article 1.5 of the Industry agreement and a remedy is in order.

## CONCLUSION

In its brief, the Association argued that damages should be paid to the 16 signatory contractors and that the Arbitrator should award:

1. Order the Union to compensate each Grievant for the lost profit that each Grievant suffered as identified on page 26 herein;

2. Award the Grievant's with the ability to unilaterally reduce its total economic package as the Grievant's see fit;

3. Order the Union to pay the arbitrator's fees consistent with section 6.5 of the Wall & Ceiling Labor Agreement; and

4. Award attorney fees for the Grievant's for the unnecessary delay in arbitrating this matter.

While the Arbitrator has concluded that the Union failed to fully comply with Article 1.5 of the Industry agreement, the Association's requested remedy, in his view, goes far beyond what the evidence establishes as the nature of the breach.  The Arbitrator views the final outcome of this matter as partially favoring the position of the Union and partially favoring the position of the Association.  Consistent with this conclusion the Arbitrator provides the remedy for the breach and the reasoning behind the remedy in the following multipoint analysis.

First, the Association strongly emphasizes that PCI, as admitted by Mr. Harris in his testimony, profited from the inappropriate industry fund payment (A Br, p 24).  The Arbitrator carefully evaluated this argument and concludes that the Association uses the word profit not in the sense that an economist would use the word.  Profit, from an economist perspective, is simply what is left over after all expenses are deducted from gross receipts.  Frankly, there is not enough evidence on the record to know whether PCI made a profit during the years in question.  That is probably the reason why Mr. Harris first responded to the question about profit with the statement, "I do not believe that is a fair representation" (audio tape).  Ultimately, the Arbitrator thinks the better term relates to the "bottom line" of an organization.  In other

words, returning the industry fund payment to PCI clearly helped its bottom line but that doesn't necessarily mean it created profit.

Second, it is clear from the record that much of the PCI industry fund was spent on internal training. From the Association's perspective, PCI's industry fund contribution does not contribute to the industry but simply reduces PCIs overhead. This, of course, provides an economic advantage to PCI. The Arbitrator in part agrees with this argument and in part disagrees. NWCCA also provides training and Mr. Baca in his testimony indicated that part of the reason for raising the industry fund payment from $.25 to $.35 was to provide additional training. Thus, the Arbitrator concludes that the fact that PCI provided it least some training with its self-administered industry fund does not necessarily create a breach of Article 1.5.

Moreover, NWCCA controls the amount of training that is provided to members. Mr. Harris made it clear that PCI ended its membership in NWCCA because of the lack of benefits coming directly back to PCI. The Arbitrator concludes that at least a part of the whole dispute that makes up this arbitration proceeding involves a continuation of the internal dialogs going on over the benefits of membership. Since NWCCA, not the Union, controls the value of membership the Arbitrator is not very

sympathetic to punishing the Union over an internal management debate related to how much training ought to be provided by NWCCA.

Third, as determined by Arbitrator Gangle and reaffirmed in this decision, the problem is not the creation of a self-administered industry fund but rather the extent to which that fund is administered consistent with the terms of the MOU. The MOU clearly requires PCI to expend its industry fund "for the purpose of promotional activities related to the Drywall Finishing Industry… provide for the costs associated with drug testing, respirator fit testing, hearing conservation testing and other industry and trade related testing and training … to defray employer costs related to collective bargaining and for services that may be provided by the Northwest Wall and Ceiling Bureau…" (U 1).

The above is what PCI agreed to in a signed, written agreement with the Union. As also emphasized by Arbitrator Gangle, this Arbitrator has no authority over the Union's collective bargaining agreement with PCI. The Union, however, is in a position to demand compliance to the written agreement. That demand should have included the necessity for PCI to expend funds toward "promotional activities related to the Drywall Finishing Industry." The absence of any evidence showing that the Union has attempted to vigorously enforce this provision is

what led the Arbitrator to conclude that Article 1.5 of the industry agreement had been violated. It was violated because PCI was allowed to use the vast majority of the industry fund monies towards providing training which reduced its overhead – an economic advantage. While some of these funds could have been spent on training within the context of an industry fund, the Union permitted by its laxness too much of the money to be used in that fashion.

Fourth, the Arbitrator takes fault with the reasoning used by the Association in claiming how much damages should be paid by the Union to the contractors. PCI is viewed to have padded its bottom line through its self-administered industry fund while the signatory contractors were not so advantaged through their payment to the Industry Fund. The primary difficultly that the Arbitrator has with this argument is that it is based on the conclusion that the signatory contractors receive zero value to their bottom line from their membership in NWCCA and their payment to the Industry Fund. The Arbitrator believes that each of the contractors does receive value to its bottom line by its membership in NWCCA.

The Arbitrator also concludes that the laxness with which the Union has exercised its oversight regarding its collective bargaining agreement with PCI has led to PCI's bottom line benefit being in excess of what the signatory contractors

receive from their contribution to the Industry Fund.  But, it would be almost impossible to calculate accurately the nature of this discrepancy since it would be difficult to calculate all of the ways in which membership in NWCCA is beneficial.

Moreover, the Arbitrator again returns to the concept of a permissive subject of bargaining.  The bottom line benefits of membership are significantly controlled[10] by the signatory contractors; not the Union.  While it is clear that PCI does directly benefit from its payment to the self-administered industry fund, this fact has to be considered in the context that the benefits of the signatory contractors' payments to the Industry Fund is, at least to a certain extent, self-determined.

<u>Finally</u>, the Arbitrator's final remedy provides no monies to the signatory contractors primarily because he is not convinced by the evidence that they have suffered any direct economic harm.  While the evidence indicates that PCI's business has increased during the term of the collective bargaining agreement, the Arbitrator finds no evidence related to the increase or decrease of the 16 signatory contractors.  However, in the absolutely booming construction economy of the City of Seattle, the Arbitrator is hard pressed to believe that any

---

[10] The Association attempted to argue otherwise in expressing the point that there is a Board that oversees the activities of NWCCA; it is not the contractors.  The Arbitrator, for the purposes of the instant case, is not impressed with this argument.  While their influence may at times be indirect, the 16 signatory contractors have a substantial say regarding what benefits are put forth by NWCCA.

contractor has suffered a reduction of work particularly as such reduction might relate to the PCI industry fund contribution.

The Association notes in its brief that "Arbitrators have wide latitude when fashioning a remedy" (E Br, p 25). This Arbitrator agrees and emphasizes that given the complexity of the facts of this case, wide latitude is certainly needed. As previously indicated, the Arbitrator's ultimate conclusion is that the MOU allowed PCI to expend money on a variety of different items one of which was promotional activities related to the industry. PCI failed to expend any industry fund monies towards promotional activities related to the industry; no expenditure helped the industry in general[11]. This was an important failure as it created an imbalance that economically advantage PCI.

The Arbitrator notes that the MOU provides for payment towards the services of the NWCB from the PCI industry fund. The Arbitrator further notes that the Association's brief lays out the fact that of the $.50 Industry Fund contribution, $.214 goes to the NWCB – 42.8%. Payment to NWCB would support the industry in general thus fulfilling that element of the MOU.

The Arbitrator concludes that the Union's liability is restricted to $.35 per compensable hour as that is the figure in

---

[11] Mr. Harris claimed in his testimony that training his employees to provided help to the industry. The Arbitrator simply does not buy this argument.

the contract that was signed by the Union.  The two raises after the contract was signed were imposed by NWCCA and not part of any documents signed by the Union.  Using the 42.8% figure found above and multiplying it times $.35 results in a figure of $.15 ($.1498).  Given all of the factors of this case, the Arbitrator concludes that had PCI submitted $.15 per compensable hour to NWCB or some other industry wide benefit it would not have been disproportionately advantaged from its self-administered industry fund.

The Arbitrator's directive to the Union, in order to remedy the breach of Article 1.5 of the Industry agreement, is to pursue payment to the NWCB from PCI for $.15 for the entire contract term (2106 through 2019) but in the event that PCI fails to provide all of this compensation, the Union stands liable.  It is the Union that agreed to Article 1.5 of the Industry CBA and it is ultimately accountable for what it agreed to.

```
IN THE MATTER OF THE ARBITRATION    )        ARBITRATOR'S
                                    )
BETWEEN                             )          AWARD
                                    )
INTERNATIONAL UNION OF PAINTERS     )
AND ALLIED TRADES DISTRICT COUNCIL  )
"IUPAT DISTRICT 5" OR "THE UNION"   )
                                    )
AND                                 )
                                    )
EMPLOYERS OF NORTHWEST WALL &       )
CEILING CONTRACTORS ASSOCIATION     )     CONTRACT INTERPRETATION
"NW WALL & CEILING" OR EMPLOYER"    )         GRIEVANCE
```

After careful consideration of all arguments and evidence, and for the reasons set forth in the Opinion that accompanies this Award, it is awarded that:

1.  The IUPAT District Council 5 did not violate Article 1.5, the most favored nations clause, of the Parties 2016-19 collective bargaining agreement when it allowed PCI to create its own industry fund and use it to establish and provide continuing financial support to an Employer-administered industry fund to provide for drug testing and safety training for employees working under this Agreement and to defray Employer costs related to bargaining.  The IUPAT District Council 5 did violate Article 1.5, the most favored nations clause, of the Parties 2016-19 collective bargaining agreement when it failed to vigorously enforce that portion of its December 1, 2017 MOU with PCI that required partial use of the Employer administered industry fund for promotional activities related to the Drywall Finishing Industry.

2.  The Union, to remedy the violation of Article 1.5, must confront PCI over its failure to comply with the terms of December 1 MOU and provide as an appropriate fix retroactive payment of $.15 per PCI compensable hour to the Northwest Wall and Ceiling Bureau.  The payment of $.15 per PCI compensable hour to NWCB should be for the entire contract period retroactive to July 1, 2016.  In the event that PCI refuses to comply, then the Union is required by this award to make that payment.

3.    The Arbitrator retains jurisdiction over this remedy for a period of 120 days or until the Parties informed him that the matter of remedy has been fully satisfied.

4.    ARTICLE 6, states "The arbitrator's fee shall be paid by the party who loses the case.  The impartial umpire may, in his discretion, allocate the fee between the Union and the Employer or NWCCA if he believes that the Union, the Employer, nor the NWCCA substantially prevailed."  In this case, neither the Union nor NWCCA substantially prevailed as NWCCA prevailed with regard to payment by the Union or PCI to NWCB, while the Union prevailed related to the establishment of a PCI industry fund.  Thus, the Arbitrator's fee is split between the two Parties.


Respectfully submitted on this, the 5th day of November, 2018 by,


Timothy D.W. Williams
Arbitrator