UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

INTERNATIONAL UNION OF PAINTERS
AND ALLIED TRADES DISTRICT
COUNCIL 5,

Plaintiff,

v.

ALLIANCE PARTITION SYSTEMS, *et al.*,

Defendants.

NO. C19-0145RSL

ORDER VACATING
ARBITRATION AWARD

This matter comes before the Court on "Defendants' Motion to Confirm the Arbitration Award Pursuant to Fed. R. Civ. P. 12(c)" (Dkt. # 26) and "Plaintiff IUPAT District Council 5's Motion for Judgment on the Pleadings to Vacate Arbitration Award" (Dkt. # 47). The plaintiff union seeks to vacate the arbitrator's finding that it violated the most favored nation clause of the parties' collective bargaining agreement ("CBA") and the chosen remedy for that breach. The defendant employers seek to have the arbitration award confirmed.

Having reviewed the memoranda and exhibits submitted by the parties, along with the remainder of the record,[1] the Court finds as follows:

---

[1] This matter can be decided on the papers submitted. Plaintiff's request for oral argument is DENIED.

ORDER VACATING
ARBITRATION AWARD - 1

## BACKGROUND

Plaintiff is a labor union representing, *inter alia*, workers involved in the commercial drywall industry. Defendants are commercial drywall contractors who employ plaintiff's members. They are also members of an industry association, the Northwest Wall & Ceiling Contractors Association ("NWCCA"). The NWCCA utilizes an "Industry Fund" to pay for its operations and activities and to contribute to the Northwest Wall & Ceiling Bureau ("NWCB"), another trade association that provides resources and services for all industry members and their customers.

NWCCA, representing defendants, negotiated a CBA with the union effective July 1, 2016 - June 30, 2019. The CBA requires each signatory employer to contribute 35¢ to the "Industry Fund" for every hour of compensable bargaining unit work. Article I, Section 1.5 of the CBA contains what is commonly referred to as a "most favored nation" clause. Essentially, the union promised that it would require any other drywall contractors with whom it contracted to pay the same "total employer cost" package as defendants and, if the union were to negotiate a contract with another contractor that had more favorable economic terms, defendants would get the benefit of those favorable terms. Dkt. # 1 at 15.

Performance Contracting Incorporated ("PCI") withdrew from the NWCCA prior to completion of the negotiations over the 2016-2019 CBA. The company no longer considered membership in NWCCA a net benefit when it compared the cost of membership with the services provided. Because NWCCA no longer represented PCI, it negotiated its own labor agreement with the union. The PCI agreement is similar in all relevant respects to the one negotiated by the NWCCA for defendants, including a requirement that PCI contribute 35¢ to an

ORDER VACATING
ARBITRATION AWARD - 2

industry fund for every hour of compensable bargaining unit work.[2] This industry fund is administered by PCI, however, rather than by NWCCA.

On October 11, 2016, defendants filed a grievance against the union, asserting that the union violated Article I, Section 1.5 of the CBA. Defendants argued that, because the agreement the union entered with PCI allowed PCI to administer its industry fund, PCI could and did use those monies to offset overhead costs rather than to pay for industry-wide resources and services, resulting in a "more favorable" economic term than that negotiated by defendants. The union denied any breach or violation, but offered to permit defendants to create and fund their own self-administered "industry funds." That offer was not accepted, and the dispute was submitted to arbitration.

Following an evidentiary hearing, the arbitrator found that the union had failed to vigorously enforce contractual provisions governing PCI's use of its industry fund. According to the arbitrator, a Memorandum of Understanding ("MOU") the union had with PCI required PCI to expend some portion of its industry fund on promotional activities related to the drywall industry, but the union allowed PCI to use the vast majority of the fund to pay for training and other overhead expenses with no discernable benefit to the industry in general. The arbitrator found that this allocation of fund monies resulted in an economic benefit to PCI over defendants and constituted a violation of Article 1.5 of the CBA. The arbitrator concluded that, had PCI paid a portion of its industry fund to the NWCB for some other industry-wide benefit, "it would not have been disproportionately advantaged from its self-administered fund." Dkt. # 1 at 114.

---

[2] The Court adopts the nomenclature used by the arbitrator, using the capitalized "Industry Fund" to indicate the fund that defendants collectively support and the lower case "industry fund" to indicate PCI's self-administered fund.

ORDER VACATING
ARBITRATION AWARD - 3

Because the arbitrator did not have any authority over PCI or the union's contractual relationship with PCI, he directed the union to encourage PCI to make a retroactive payment to NWCB of 15¢ per compensable hour for the entire term of the CBA (2016-2019) or, if its efforts were unsuccessful, to make the payment itself.

The union argues that the arbitrator's award is not based on the collective bargaining agreement and represents nothing more than his own brand of industrial justice. In particular, the union argues that any violation of the most favored nation clause arose from PCI's internal business decisions regarding how to allocate its industry fund. In addition, plaintiff challenges the remedy crafted by the arbitrator, arguing that he ignored the clear and specific remedial provision found in the relevant section of the CBA.

## STANDARD OF REVIEW

In the labor context, the grievance mechanisms specified in a collective bargaining agreement, including arbitration, are not only a means of resolving disputes, but also "a vehicle by which meaning and content are given to the collective bargaining agreement." Sw. Reg. Council of Carpenters v. Drywall Dynamics, Inc., 823 F.3d 524, 529-30 (9th Cir. 2016) (quoting United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 581 (1960)).

> Because of the centrality of the arbitration process to stable collective bargaining relationships, courts reviewing labor arbitration awards afford a nearly unparalleled degree of deference to the arbitrator's decision. This deference applies both to the arbitrator's interpretation of the parties' agreement and to his findings of fact.
>
> With regard to contractual interpretation, as the Supreme Court has admonished, the parties have authorized the arbitrator to give meaning to the language of the agreement, so a court should not reject an award on the ground that the arbitrator

misread the contract. We have taken this instruction to heart, explaining that even if we were convinced that the arbitrator misread the contract or erred in interpreting it, such a conviction would not be a permissible ground for vacating the award. Indeed, since the labor arbitrator is designed to function in essence as the parties' surrogate, he cannot "misinterpret" a collective bargaining agreement. In this sense, his award is their contract. Thus, as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, his award must be upheld.

Drywall Dynamics, 823 F.3d at 530 (internal quotation marks, citations, and alterations omitted). The circumstances in which an arbitration award will be vacated are limited to:

> (1) when the award does not draw its essence from the collective bargaining agreement and the arbitrator is dispensing his own brand of industrial justice; (2) where the arbitrator exceeds the boundaries of the issues submitted to him; (3) when the award is contrary to public policy; or (4) when the award is procured by fraud.

S. Cal. Gas Co. v. Util. Workers Union of Am., Local 132, AFL–CIO, 265 F.3d 787, 792-93 (9th Cir. 2001). The union argues that the arbitration award in this case should be vacated because it does not draw its essence from the collective bargaining agreement and represents the arbitrator's own brand of industrial justice.

## DISCUSSION

The contract at issue here is the CBA between the union and defendants. The Court must determine whether the arbitration award drew its essence from that agreement.

**A. Breach of Article I, Section 1.5**

The arbitrator interpreted the most favored nation clause in the CBA as an effort to create a level economic playing field amongst all employers performing bargaining unit work. Dkt. # 1 at 90, 93, 101, 102, 106-07. See also Article I, Section 1.5 ("The parties to this Agreement

ORDER VACATING
ARBITRATION AWARD - 5

recognize . . . the necessity of assuring the competitive position of the parties with the Exterior and Interior Industry during the term of this Agreement).[3] He specifically found that the creation of an industry fund administered by PCI did not, in and of itself, violate the most favored nation clause because PCI committed to pay the exact same amounts as defendants and the union's various contracts with PCI required it to expend at least some portion of its industry fund on promotional activities related to the drywall industry . Dkt. # 1 at 99 and 103. Had PCI complied with that requirement, its cost per bargaining unit work would have approximated those paid by defendants and, according to the arbitrator, there would have been no grounds for a grievance or arbitration. PCI did not, however, make "any expenditure that could be called promotional activities for the industry" and had, in fact, diverted those funds to offset expenses that defendants were bearing out of pocket. In those circumstances, the arbitrator found that PCI gained an economic advantage over its competitors. Dkt. # 1 at 104. The arbitrator concluded that PCI's diversion of funds from industry promotional expenditures to its own benefit meant that the union had violated the most favored nation clause of its contract with defendants. Id.

The union takes issue with this conclusion, arguing that a third-party's post-contracting expenditure decisions - in violation of its own promises to the union - cannot constitute a breach on the part of the union where the union lacks the capacity to control those decisions. Dkt. # 47 at 7. The arbitrator concluded, however, that the union does have the capacity to control PCI's

---

[3] The union's repeated assertion that the arbitrator found that the most favored nation provision was concerned only with the amounts paid by various employers as compensation (see, e.g., Dkt. # 47 at 8) and not with broader economic realities that impact total costs (such as the existence of rebates and/or the diversion of funds) is not supported by the record. Because that assertion forms the basis of the union's argument that the arbitrator disregarded his own interpretation of the CBA in finding a breach of Article I, Section 1.5, the argument is rejected.

ORDER VACATING
ARBITRATION AWARD - 6

actions in this regard and that it failed to do so. The arbitrator interpreted the MOU between PCI and the union as (a) limiting the uses to which the industry fund could be put, (b) establishing a joint Labor-Management committee to oversee the expenditures, and (c) requiring the union to exercise control over fund expenditures. Dkt. # 1 at 106-07 ("Having agreed to terms that required it to exercise control, the Union was required to do so in a way that ensured the level economic field required by Article 1.5 of the Industry agreement."). Based on this interpretation of the MOU, the arbitrator found that it was the union's failure to exercise the control it had negotiated for itself that put the union in breach of Article 1.5's mandate that "[a]ny signatory contractors performing work scopes covered by this Agreement shall be required by the Union to pay an amount equal to the total employer cost."

The union argues, with some support, that it did not actually have the power to control PCI's expenditure decisions, but the arbitrator interpreted the MOU and found to the contrary.[4] He therefore determined that the union should be held responsible for its own failings, not directly for the expenditure decisions of a third-party. Because his conclusion was based on an interpretation of the CBA between the parties, it cannot be rejected simply because the Court would have reached a different result or is convinced that the arbitrator made a serious error. "[A]s the Supreme Court has admonished, the parties have authorized the arbitrator to give meaning to the language of the agreement, so a court should not reject an award on the ground that the arbitrator misread the contract." Drywall Dynamics, 823 F.3d at 530 (internal quotation

---

[4] Even if the union's ability to influence the way PCI spent its industry fund were limited, the arbitrator's finding of breach is based in large part on the fact that the union did not even try to enforce the contractual requirement that PCI expend funds toward "promotional activities related to the Drywall Finishing Industry." Dkt. # 1 at 100 and 110-11.

ORDER VACATING
ARBITRATION AWARD - 7

marks and alterations omitted).

**B. Remedy**

"When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies." United Steelworkers of Am. v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960). Where the parties, in negotiating the CBA, provided for a specific remedy in a particular contingency, however, the arbitrator is not free to rewrite the contract.

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

Id.

In this case, the arbitrator acknowledged that the CBA specifies the remedy for a breach of the most favored nation provision: if the union negotiates a contract with another contractor that has more favorable economic terms, defendants are entitled to the benefit of the same favorable terms. Dkt. # 1 at 15. In finding a breach of Article I, Section 1.5, the arbitrator found that the union had negotiated a contract with PCI that tilted the economic field in its favor because the union allowed PCI to spend all of its industry fund on training and other overhead expenses rather than on promotional activities for the industry. It is undisputed that the union made oral and written offers to provide a similar self-directed fund to defendants. Dkt. # 1 at 105. The arbitrator found, however, that this remedy would be "awkward" and instead fashioned

ORDER VACATING
ARBITRATION AWARD - 8

a remedy designed to make up the shortfall in funding for industry-wide promotional activities that occurred when PCI chose to use its entire industry fund for training and overhead expenses: it directed the union to encourage PCI to make back payments to an industry trade association or to make the payments itself. The chosen remedy is wholly untethered to the collective bargaining agreement and reflects nothing more than the arbitrator's concept of what is fair and just in the circumstances.

## CONCLUSION

The arbitrator's finding that the union breached Article I, Section 1.5 of the CBA is grounded in his interpretation of the contract, but the remedy he fashioned for that breach ignores the relevant contractual provision in favor of the arbitrator's own brand of industrial justice. For all of the foregoing reasons, plaintiff's motion to vacate the arbitration award (Dkt. # 47) is GRANTED and defendants' motion to confirm the arbitration award (Dkt. # 26) is DENIED. The Clerk of Court is directed to enter judgment vacating the November 5, 2018, Arbitrator's Opinion and Award.

Dated this 26th day of July, 2019.

Robert S. Lasnik
United States District Judge

ORDER VACATING
ARBITRATION AWARD - 9